**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harvey Keith SMITH, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard H. PALMER, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Susan J. GRIMM, a/k/a Joan Edwards,**
**Defendant–Appellant.**

**Nos. 93–5582, 93–5597 and 93–5610.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1994.

Decided Jan. 25, 1995.

---

**ARGUED:** Jeffrey Steven Jacobovitz, Washington, DC, for appellant Smith, Arcangelo M. Tuminelli, Baltimore, MD, for appellant Grimm, Bill D. Burlison, Crofton, MD, for appellant Palmer. Dale Preston Kelberman, Asst. U.S. Atty., Joseph Harrison Young, Asst. U.S. Atty., Baltimore, MD, for appellee. **ON BRIEF:** Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for appellee.

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MURNAGHAN and Judge MOTZ joined.

## OPINION

NIEMEYER, Circuit Judge:

Harvey Keith Smith, Susan J. Grimm, and Richard H. Palmer were convicted of various counts of money laundering and wire fraud, based on their participation in a scheme to defraud Lagusa, Inc., a distributor of luxury motorcoaches manufactured in Belgium, as well as five lenders called upon to finance the purchase of buses from Lagusa. Palmer was also convicted of income tax evasion. The parties assign errors to numerous aspects of the trial leading to their convictions. For the reasons that follow, we reject their challenges and affirm the judgments of the district court, 818 F.Supp. 132.

## I

Harvey Keith Smith controlled several corporations engaged in leasing luxury motorcoaches to charter bus companies. His principal company was Red Arrow Lines, Inc. Because Smith owed an estimated $44 million in connection with a failed resort development project in Arizona and wished to avoid his creditors, he held the stock in his motorcoach leasing companies in the name of his girlfriend, Susan J. Grimm.

During the period from May 1987 through August 1988, Smith and Grimm carried out a

scheme under which they fraudulently induced lenders to advance money to Lagusa, Inc., to finance Red Arrow Lines' buses. Then, with the help of Lagusa's president, Richard Palmer, to whom they paid kickbacks, Smith and Grimm had the proceeds from these loans transferred to an account for their own benefit. In furtherance of the scheme, Smith and Lagusa fraudulently prepared financial statements for Grimm, listing assets that she did not own, and submitted them to at least five different lenders,[1] together with phony manufacturers' certificates of origin for buses which had not been manufactured. The certificates of origin were created by Palmer in return for over $85,000 in kickbacks paid by Smith and Grimm. During the period of 1987–88 the lenders advanced more than $2.9 million to Lagusa on behalf of Red Arrow Lines, ostensibly to finance Red Arrow Lines' acquisition of 12 nonexistent buses. The loan proceeds were then transferred from Lagusa to the Florida bank account of a trust known as the "Grimm–Gray Trust." Smith, who controlled that bank account, thereafter withdrew the money from the trust to fund a lavish lifestyle for himself and Grimm and to provide operating expenses for Smith's other ventures. While Palmer did not share directly in the loan proceeds, he was paid fees and commissions which he did not disclose to his employer Lagusa or to the IRS.

Smith was convicted of eight counts of wire fraud in violation of 18 U.S.C. § 1343 and five counts of money laundering in violation of 18 U.S.C. § 1957. He was acquitted of tax fraud charges. He was sentenced to 87 months imprisonment. Grimm was convicted of five counts of wire fraud and five counts of money laundering. The jury could not reach a verdict on three counts charging Grimm with wire fraud, and it acquitted her of tax fraud charges. She was sentenced to 46 months imprisonment. Finally, the jury convicted Palmer of eight counts of wire fraud, five counts of money laundering, and three counts of tax fraud. He was sentenced to 37 months imprisonment.

## II

Smith contends that Counts 9 through 13 of the indictment failed to charge him properly with money laundering and that therefore those counts must be dismissed. He argues that by merely charging that the funds laundered "were the proceeds of a wire fraud, in violation of 18 U.S.C. § 1343," without giving the details of the wire fraud, the indictment failed to allege a necessary element of the offense of money laundering—that the property be "derived from specified unlawful activity," 18 U.S.C. § 1957(a).

In further support of his argument that the money laundering counts must be dismissed, Smith contends that the money transfers from Lagusa to the Grimm–Gray Trust "cannot constitute both wire fraud [in violation of 18 U.S.C. § 1343] and transactions in criminally derived property under 18 U.S.C. § 1957." He argues that a charge of money laundering can apply only *after* unlawful proceeds have been obtained and that it cannot apply to money that is not yet unlawfully derived. *See United States v. Johnson,* 971 F.2d 562, 569 (10th Cir.1992) (in enacting § 1957, "Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity"). Thus, Smith maintains that since the final step of the wire fraud, as alleged, was the transfer of funds to the Grimm–Gray Trust, that transaction cannot simultaneously form the basis of a money laundering charge.

When considering whether an indictment properly charges an offense, we are guided by basic principles that (1) the indictment must contain a statement of "the essential facts constituting the offense charged," (2) it must contain allegations of each element of the offense charged, so that the defendant is given fair notice of the charge that he must defend, and (3) its allegations must be sufficiently distinctive so that an acquittal or conviction on such charges can be pleaded to bar a second prosecution for the same offense. *See* Fed.R.Crim.P. 7(c)(1);

---

1. General Electric Capital Corporation of Eden Prairie, Minnesota; Textron Financial Corporation of Paramus, New Jersey; Charter Financial, Inc. of New York, New York; Sogelease Corp. of New York, New York; and Signal Capital Corp. of Hampton, New Hampshire.

*Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962). The allegations of an offense are generally sufficient if stated in the words of the statute itself. *See Hamling,* 418 U.S. at 117, 94 S.Ct. at 2907–08; *United States v. Fogel,* 901 F.2d 23, 25 (4th Cir.), *cert. denied,* 498 U.S. 939, 111 S.Ct. 343, 112 L.Ed.2d 308 (1990). If an indictment contains multiple counts, each count is viewed as a separate indictment for purposes of determining its sufficiency. *See Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). In sum, an indictment and each count within it must be sufficient to give a defendant notice of the charge so that he can defend against it and plead an acquittal or conviction as a bar to a subsequent effort to prosecute him for the same offense.

■ Applying these principles to the indictment charging Smith, we conclude that the money laundering counts meet the necessary requirements. Count 9 of the indictment, which is typical of the other money laundering counts set out in counts 10 through 13, charges Smith with "caus[ing] $374,578.00 to be transferred and deposited to the Grimm–Gray Trust account at the Sun Bank, Ft. Lauderdale, Florida, which funds were the proceeds of a wire fraud, in violation of 18 U.S.C. § 1343." The indictment states that the transfer occurred in Maryland "[o]n or about August 13, 1987." Finally, it alleges money laundering, using the specific statutory language, and provides statutory citations.[2] This count thus contains a concise

statement of the facts which not only are essential to constitute the offense of money laundering,[3] but also are sufficient to identify and distinguish the transaction at the heart of the offense, i.e., a deposit of $374,578 on August 13, 1987, into the account of the Grimm–Gray Trust at the Sun Bank in Ft. Lauderdale, Florida. The money so transferred is also alleged to be the proceeds of a wire fraud in violation of § 1343. These factual allegations provide adequate notice to Smith to defend against this charge and to plead an acquittal or conviction of this charge against any subsequent effort to prosecute a money laundering charge based on that same transaction.

Smith argues nevertheless that the specified unlawful activity, from which the $374,-578 was derived, is not adequately alleged. He observes that the counts alleging wire fraud "set[ ] forth several classes of alleged victims and multiple theories of guilt" and contends therefore that he is not adequately advised of the charges. Smith's contention, we believe, feigns confusion. The core transaction constituting the offense of money laundering is alleged with specificity and detail, and Smith cannot fail to know what transaction forms the basis of the charge.

The money laundering statute requires, and Count 9 charges, that the money deposited into the Grimm–Gray Trust account be derived from "specified unlawful activity." While it is necessary in order to state a money laundering offense to include such an allegation, the requirement is merely a categorical delineation of the type of funds that are subject to a money laundering charge.

---

**2.** Thus, Count 9 provides in full:
And the Grand Jury further charges:
1. The allegations contained in paragraphs one through and including paragraph five of Count One are hereby realleged and incorporated by reference as though fully set forth herein.
2. On or about August 13, 1987, in the State and District of Maryland, and elsewhere,
**HARVEY KEITH SMITH,**
**SUSAN J. GRIMM,**
and
**RICHARD H. PALMER**
the defendants herein, did knowingly engage in a monetary transaction in criminally derived property having a value greater than $10,000 and which was derived from a specified unlaw-

ful activity, in that the defendants did cause $374,578.00 to be transferred and deposited to the Grimm–Gray Trust account at the Sun Bank, Ft. Lauderdale, Florida, which funds were the proceeds of a wire fraud, in violation of 18 U.S.C. § 1343.
18 U.S.C. § 1957.
18 U.S.C. § 2.

**3.** The pertinent portion of 18 U.S.C. § 1957 provides:

Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished....

The core of money laundering, which distinguishes one such offense from another, is the laundering transaction itself. Because the requirement that the funds be illegally derived is not the distinguishing aspect and therefore does not lie at the core of the offense, details about the nature of the unlawful activity underlying the character of the proceeds need not be alleged.

■ Just because the statute requires that funds be obtained from *"specified"* unlawful activity does not mean that the government is required to detail the circumstances of the unlawful activity. Rather, the term "specified unlawful activity" is a defined term referring to a list of offenses which qualify as unlawful activity for purposes of stating a money laundering offense. Section 1957(f)(3) adopts the definition of "specified unlawful activity" given in 18 U.S.C. § 1956(c)(7), which in turn lists five separate categories of offenses that constitute "specified unlawful activity." Wire fraud, penalized under § 1343, is included as a "specified unlawful activity" for purposes of money laundering in 18 U.S.C. § 1956(c)(7)(A). Count 9 of Smith's indictment alleged not only that proceeds were derived from specified unlawful activity, but that the activity violated 18 U.S.C. § 1343, which penalizes wire fraud. Nothing more need be alleged.

■ Smith argues further that if he is to assume that the wire fraud counts alleged elsewhere in the indictment are the basis for the specified unlawful activity contained in the money laundering counts, then the money laundering counts are defective because when the money was allegedly transferred to the Grimm–Gray Trust, it was not yet derived from an illegal source. He bases his argument on the fact that the wire fraud counts alleged that the wire fraud scheme *concluded* with the transfer of the money from Lagusa to the Grimm–Gray Trust account. If the money did not constitute illegal proceeds of a wire fraud until the Grimm–Gray Trust transaction was complete, he argues, this final transfer could not simultaneously form the basis of money laundering. We reject this argument on two grounds.

■ As already noted, each count of an indictment must stand on its own. But if one count incorporates paragraphs from other counts, the incorporated paragraphs too may be considered in determining whether a count properly charges an offense. *See* Fed. R.Crim.P. 7(c)(1). In this case the money laundering counts incorporated only paragraphs one through five of Count 1 of the indictment, which are mere background allegations. The money laundering counts do not incorporate the wire fraud counts. Consequently the wire fraud counts should not be considered part of any money laundering count when reviewing its adequacy. Nevertheless, for the reasons that we have already given, we conclude that the money laundering counts standing alone properly charge Smith with the money laundering offense. To question whether the government, in proving the money laundering charges, establishes the fact that illegal proceeds existed *before* the laundering transaction is a question of proof, not a question of the adequacy of the indictment.

■ But even if the wire fraud counts were incorporated by reference into the money laundering counts, the money laundering counts would still pass muster. When Smith and Grimm fraudulently induced five lenders to wire loan proceeds to Lagusa based on false financial statements and false documents of title, the wire fraud offenses were completed. At that point, the money in the hands of Lagusa constituted proceeds from unlawful activity. That the wire fraud *scheme* as alleged (in paragraphs 7–14 of Count 1) included further transactions does not detract from the fact that the money wired from the lenders to Lagusa, once received by Lagusa, constituted proceeds derived from an unlawful activity for purposes of a money laundering offense under 18 U.S.C. § 1957.

■ In his reply brief, Smith argues for the first time that when Lagusa received the proceeds of the fraudulently procured loans, Smith neither possessed nor controlled these funds and therefore he could not be the subject of money laundering charges. In advancing this argument, he relies on *United States v. Piervinanzi*, 23 F.3d 670, 677 (2nd

Cir.1994) (the language of § 1957 "demonstrates a congressional intent that the proceeds of a crime be in the defendant's possession before he can attempt to transfer those proceeds in violation of § 1957"). While we need not consider an argument raised for the first time in a reply brief, *see United States v. Vogt,* 910 F.2d 1184, 1198 (4th Cir.1990), we conclude nonetheless that this argument is without merit. First, it is not an argument for dismissing the money laundering counts. We have found those counts adequate on their face. Rather it is, again, a question of proof. But even as a matter of proof, the claim has no merit because the transfer from the lenders to Lagusa was made pursuant to a scheme to defraud which was devised by and participated in by Smith. He was in constructive control of the entire scheme to defraud, directing both Palmer and Grimm in carrying it out, and he was therefore in constructive possession and control of the fraudulently procured funds at the time those funds were transferred in violation of § 1957. Moreover, in each of the money laundering counts Smith was also charged with aiding and abetting under 18 U.S.C. § 2 and therefore would not in any event be required to be in possession of the money as it was being laundered.

In sum, we conclude that Smith was properly charged in Counts 9 through 13 with money laundering by causing the proceeds of wire fraud to be transferred into the Grimm–Gray Trust.

### III

We address next Smith's and Palmer's contentions that the district court abused its discretion in denying their motions for severance under Federal Rule of Criminal Procedure 14. Smith and Palmer each argue that the differences in the three defendants' positions at trial prejudiced his ability to present an effective defense and unduly prejudiced him before the jury.

Smith argues that his codefendants, Grimm and Palmer, "painted a picture" in which they were victims of Smith's criminal influence and claimed that Smith "misled or hooked" them into partaking in the scheme to defraud. Smith notes that Grimm and Palmer often joined the government in various evidentiary objections when presented with the opportunity of portraying Smith as the criminal and themselves as victims. As a consequence, Smith argues, the defenses of his codefendants were largely antagonistic to his defense, resulting in substantial prejudice to him.

Likewise, Palmer maintains that he was prejudiced by the district court's denial of his motion for severance. He argues that he was a minimal participant in this criminal scheme and has "led a blameless life other than the allegations of the indictment." He contends that the evidence presented by his codefendants prejudicially "spilled over" to unfairly implicate him. In particular, he points to evidence that Smith had a poor accounting record and personal financial history and that Grimm used an alias in attempting to evade service of process, wrongdoings in which Palmer had no part.

We initially observe that Federal Rule of Criminal Procedure 8 contemplates the joinder of offenses and defendants in cases where the defendants are charged in a single common scheme or plan. The government has broad discretion in initiating and structuring a prosecution, including the joinder of claims and defendants which qualify for joinder under Rule 8. As a counterpoint to Rule 8, Rule 14 gives the district court discretion to order separate trials on counts or as to defendants "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment." Fed.R.Crim.P. 14. Such prejudice may be shown only where there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). In deciding whether to grant a Rule 14 motion, the district court is given broad discretion in weighing the inconvenience and expense to the government and witnesses in conducting separate trials against the prejudice to the defendants caused by a joint trial. Because joint participants in a scheme often will point the finger at each other to deflect guilt from

themselves or will attempt to lessen the importance of their role, a certain amount of conflict among defendants is inherent in most multi-defendant trials. In order to justify a severance, however, joined defendants must show that the conflict is of such magnitude that "'the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *United States v. Becker*, 585 F.2d 703, 707 (4th Cir.1978) (citation omitted), *cert. denied*, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979) (quoting *United States v. Ehrlichman*, 546 F.2d 910, 929 (D.C.Cir. 1976), *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977)).

While the defendants in this case directed blame at Smith as the architect of the scheme, the evidence of their willing participation was adequate and the facts establishing their participation were sufficiently distinguishable for the jury to assess independently the guilt of each participant. Each of the defendants in this case took the stand and testified that he or she did not participate in the fraud. The jury had ample opportunity to assess the evidence and was fully and properly instructed by the court on how to assess the evidence independently with respect to each defendant. Moreover, the defendants did not make a strong showing of prejudice based on the court's denial of severance. The scheme involved all three defendants in different ways that were not likely to cause the jury to confuse each participant's role. Accordingly, we cannot find that the district court abused its discretion. *See United States v. Riley*, 991 F.2d 120, 125 (4th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 392, 126 L.Ed.2d 341 (1993) (district court is "vested with substantial discretion in determining whether to sever properly joined defendants."); *United States v. Santoni*, 585 F.2d 667, 674 (4th Cir.1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979) (district court's denial of severance motion will be overturned only when a "clear abuse" of discretion has been shown).

## IV

■ Palmer contends that the district court committed reversible error in denying his motions for a mistrial based on a 32–day mid-trial continuance. The trial began on January 25, 1993, and lasted until March 11, 1993. It was recessed from March 11 to April 12, 1993, a hiatus of 32 days, and then resumed, lasting from April 12 until April 30, 1993, when the jury returned its verdicts.

When scheduling the trial, the district court and the parties anticipated that the trial would last for six to eight weeks. When it appeared that the trial would extend beyond this time frame, the district judge scheduled an 11–day break, March 12 through March 22, with the consent of all the parties, to accommodate his vacation plans. Because the judge was concerned that this hiatus might cause the jurors to forget the testimony that they had heard, before adjourning he instructed the jury to "[t]hink about the case over the week so it remains fresh" and remember that "the time for you all to make up your minds is after the last word has been said in closing argument."

Over the course of this scheduled break, Smith suffered an illness that required surgery on March 16. On the advice of Smith's treating physician, the district judge extended the scheduled break until April 12, when the trial resumed and continued until its completion on April 30. During the hiatus, Palmer twice filed motions for mistrial, which the district court denied. But during the break, when the judge wrote a letter to the jurors to inform them that trial would resume on April 12, he instructed them to "[m]entally review the case so that the passage of time will not dull your memory of the evidence, but do not reach any firm conclusions (keep an open mind)." When the trial resumed on April 12, Palmer again renewed his motion for a mistrial based on the 32–day hiatus.

Palmer argues that this 32–day hiatus precluded him from receiving a fair trial because it occurred at a stage in the trial after the jury had heard fully from the government and the other defendants, but before he had presented his case. Thus, he argues, the jury had an extended period to contemplate the government's position without hearing any countervailing argument. The government, on the other hand, contends that if any party was prejudiced by the delay, it was the

government, since the jurors had Palmer's testimony fresh in their minds as they began to deliberate, while weeks had passed since the jury had last heard from the prosecution.

 The decision whether to declare a mistrial is left to the sound discretion of the trial judge. *See United States v. West,* 877 F.2d 281, 287–88 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *United States v. Alonzo,* 689 F.2d 1202, 1204 (4th Cir.1982). In making such a determination, the district court should consider whether there are less drastic alternatives to declaring a mistrial. *See United States v. Jorn,* 400 U.S. 470, 485–86, 91 S.Ct. 547, 557–58, 27 L.Ed.2d 543 (1970).

In this case, the district judge believed that his repeated instructions to the jurors, both in court and by letter, to keep the case fresh in their minds and to keep an open mind until all the evidence was in, were sufficient to cure any possible prejudice to Palmer resulting from the hiatus. The judge also prescribed the following mitigating measures:

> First, counsel will be given full benefit of closing argument and I will entertain any motion that counsel wish to make to extend closing argument from the normal time limit specified in the local rules to minimize the freshness problem.
>
> Second, the jury will have the benefit of all of the exhibits. I have noted the jury throughout the trial taking notes; many of the jurors have been taking extensive notes. These notes will be available to them.
>
> \* \* \* \* \* \*
>
> Next, there will be extensive jury instructions. I find that the situation that we're in is little different from a long trial in which a jury is expected to remember evidence that was presented to them over a period as long as a year and a half.... [O]ur case is somewhat different because we have had a hiatus from which the jury is not being reminded of all the facts, but I find our jury is a lot more likely to recall the evidence that took place three or four weeks ago than a jury would be that heard evidence 13 or 14 months ago.

Thus, the district court took care to protect against any potential prejudice to Palmer due to the trial hiatus.

Inherent in the presentation of any trial lasting a period of days or months is the difficulty caused by the passage of time. As events move further to the past they may be lost through the foibles of memory or they may become fixed as an accepted reality, depending on the impression of the event. Longer trials only intensify this problem. Obviously, the problem can be aggravated by introducing unnecessary delays during the course of trial, and to the extent that such delays can be avoided, district courts should recognize their responsibility for doing so.

Having recognized this inherent problem in lengthy trials and having considered the district court's ameliorating measures, we conclude that the district court did not abuse its discretion in declining to grant a mistrial because of the 32–day hiatus in this case. While the hiatus was a long one for a jury trial and can be tolerated only as a rare exception, the district court was fully aware of the difficulties the hiatus presented and took repeated steps to mitigate the potential for prejudice. Furthermore, Palmer has demonstrated no *actual* prejudice. While Palmer speculates that because the government's case was presented first, it became entrenched in the minds of the jurors during the hiatus, it can just as easily be speculated that because the government's case was more remote in time, the strength of the prosecution's evidence faded in the jurors' minds. To grant a mistrial is a drastic remedy that results in additional expense to the judicial system as well as to all the parties. In this case, at least six weeks of trial time would have been lost. Moreover, if Palmer's motion for a mistrial were granted in this case, the district court would undoubtedly have been confronted with arguments by other defendants that a new trial would subject them to double jeopardy. *See, e.g., Dunkerley v. Hogan,* 579 F.2d 141, 147–48 (2nd Cir.1978), (holding that mistrial was not justified by "manifest necessity" for double jeopardy purposes when district court could instead have continued the trial for 7 to 10 days in the face of defendant's emergency

hospitalization), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). Taking all of these factors into account, we conclude that the court did not abuse its discretion in declining to grant Palmer a mistrial based on the 32–day mid-trial continuance.

## V

■ Grimm contends that the district court abused its discretion in declining to grant her motion for a mistrial based on the government's alleged intimidation of her expert witness, Bruce Pavesich, a banking expert retained by Grimm who later decided not to testify on her behalf. Grimm contends that Pavesich changed his mind because the government badgered him with telephone calls from the IRS and issued a subpoena to him to produce a burdensome number of documents. In advancing this argument, Grimm relies upon *United States v. Saunders,* 943 F.2d 388, 392–93 (4th Cir.1991) (substantial government interference with defense witness's free and unhampered choice to testify may violate defendant's right to due process), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).

The contention that the government's conduct was improperly motivated or that it caused Pavesich not to testify, however, is not supported by the facts developed at trial and found by the district court. At a hearing conducted on this issue, both Pavesich and his employer testified that the government had not intimidated him into refusing to testify. Pavesich stated that he decided not to testify because of his company's established policy against having its employees serve as expert witnesses. Based on this testimony, the district court found that the government had not improperly interfered with Grimm's right to have an expert testify on her behalf at trial and, accordingly, denied Grimm's motion for a mistrial. The court found, alternatively, that it would not have admitted Pavesich's testimony in any event. Pavesich was expected to testify that the lenders who were fraudulently induced to wire funds to Lagusa acted negligently. The judge concluded, however, that the lenders' negligence would not constitute a defense to wire fraud, and thus any expert testimony tending to estab-lish the lenders' negligence would not have been relevant.

Based on the district court's factual findings, which are not clearly erroneous, we cannot conclude that the government's contact with Grimm's expert amounted to " 'substantial government interference with a defense witness' free and unhampered choice to testify,' " *Saunders,* 943 F.2d at 392, or that the court abused its discretion in refusing to grant a mistrial.

## VI

■ Grimm next contends that the district court abused its discretion in restricting her cross-examination of Special Agent Jules Dorner of the IRS, a witness called by the government. Dorner was called to summarize financial documents for the sole purpose of tracing the flow of cash from the various lenders through Lagusa to the Grimm–Gray Trust. When Grimm sought to cross-examine Dorner to ascertain whether certain of these transfers were properly characterized as loans or bribes, the district court disallowed the inquiry because it was outside the scope of direct examination. The district court, however, did allow Grimm to examine Dorner on other points which were within the scope of direct examination or which went to Dorner's credibility. Additionally, Grimm was invited to call Dorner in her own case to pursue fully the line of inquiry that the district court disallowed on cross-examination. In these circumstances, the district court acted well within its discretion. *See United States v. Crockett,* 813 F.2d 1310 (4th Cir.), *cert. denied,* 484 U.S. 834, 108 S.Ct. 112, 98 L.Ed.2d 71 (1987).

## VII

■ Palmer contends that the government's evidence was insufficient to support his convictions on the wire fraud and money laundering counts and that therefore the district court erred in refusing to grant his motions for judgment of acquittal. A cursory examination of the facts reveals that this contention is without merit. In reviewing this question, we take the facts in the light most favorable to the government, and if

"*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we affirm the jury's verdict. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■ On the wire fraud counts, the evidence adduced at trial established that Palmer inflated the sale price of certain motorcoaches and channeled the excess funds provided by the lenders back to Smith and Grimm. Evidence also showed that Palmer forwarded sham manufacturers' certificates of origin and commercial invoices for several motorcoaches which had not yet been manufactured. For his participation in these schemes, Smith and Grimm paid Palmer more than $85,000 in kickbacks. In addition, one of the defrauded lenders testified that both Palmer and Smith assured him that two motorcoaches he had been asked to finance had been delivered to Red Arrow Lines and were operating, inducing that lender to approve certain other loans. Palmer conceded at trial that such motorcoaches had not even been manufactured at that time. This evidence amply supports the jury's guilty verdict on the wire fraud charges.

■ With respect to the money laundering charges, Palmer argues that he could only be found guilty of money laundering if he knew that the Grimm–Gray Trust was not a legitimate escrow or trust account. He maintains that the evidence was insufficient to show that he knew the Grimm–Gray Trust was not legitimate; thus, he contends, he is entitled to an acquittal on the money laundering counts. This argument, however, fails to appreciate the essence of the money laundering offense. Section 1957 requires a showing that Palmer knowingly engaged in a monetary transaction involving criminally derived property with a value greater than $10,000, irrespective of the recipient in such a transaction. *See* 18 U.S.C. § 1957(a). Based on the same facts that supported the jury's verdict on the wire fraud count, the jury could well have found beyond a reasonable doubt that Palmer knew that the funds he transferred from Lagusa to the Grimm–Gray Trust constituted "criminally derived property," having been obtained through wire fraud. Thus the motion for judgment of acquittal on the money laundering count was properly denied by the district court.

## VIII

■ Smith assigns error to various aspects of the district court's instructions to the jury. He contends that the district court failed to instruct the jury to convict only if they agreed unanimously on the identity and extent of the scheme to defraud. However, a review of the instructions given reveals that the court did give such a charge. The court instructed the jury as follows:

> In order to find the defendants responsible for participating in the fraudulent scheme as alleged in the indictment, *each of you* must find that the defendants participated in the *same single scheme to defraud* and that the scheme to defraud in which the defendants are found to have participated is *substantially the same scheme as the overall fraudulent scheme alleged in the indictment.*

> To sustain its burden of proof, however, the government is not required to prove all of the components of the scheme to defraud that are alleged in the indictment. If the government proves beyond a reasonable doubt a scheme to defraud that contains some or all of the components in the indictment, but is simply more narrow than the scheme to defraud as defined in the indictment, then the government has carried its burden of proof. *You must unanimously agree, however, on the components of the scheme to defraud.*

(Emphasis added).

Smith also contends that the district court erred in not giving the good faith instruction and an instruction with respect to reliance on the advice of counsel and accountants in the form submitted by him. While the court may not have given the instruction in the form submitted by Smith, the court did properly instruct the jury on those subjects. The district court is not required to give defendant's particular form of instruction, as long as the instruction the court gives fairly cov-

 

ers a theory that the defense offers. *See United States v. Fowler*, 932 F.2d 306, 316–17 (4th Cir.1991). Because Smith is unable to contend that the court's instructions did not cover his theory of defense or did not fairly state the controlling law, he has not demonstrated any reversible error.

## IX

■■ Finally, Smith contends that the district court abused its discretion in failing to grant Smith's counsel the opportunity to present further argument to the jury after the court issued a supplemental jury instruction.

During the course of deliberations, the jury requested clarification of the definitions of fraud and good faith. The district court gave the jury supplemental instructions stating, "If a defendant knowingly provided materially false information in order to induce a loan, the crime is complete and it is irrelevant whether or not he intended to repay it or was capable of repaying it." Smith argues that because the district court gave "new law" to the jury in this supplemental instruction, the court should have given counsel an opportunity for additional argument to the jury, particularly since Smith emphasized in his closing argument that his intent to repay *was* a good faith defense to fraud (contrary to the law and to the court's supplemental instructions). Smith relies for support on *United States v. Horton*, 921 F.2d 540, 547 (4th Cir.1990), *cert. denied*, 501 U.S. 1234, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991) (abuse of discretion may be found when the court limits argument after supplemental instructions which present a new theory of the case and thereby prevents defense counsel from making a point essential to the defense).

Because we find that the court's supplemental instruction did not present a new theory of the case to the jury, we hold that the district court was not required to afford counsel an opportunity to provide additional argument. The district court's supplemental instruction in this case merely amplified the initial instructions regarding wire fraud and the good faith defense which had already been given.

For the foregoing reasons, we affirm the judgments of the district court.

*AFFIRMED.*