**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4362

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JENNIFER RAE MCDONALD,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth K. Dillon, Chief District Judge.  (5:21-cr-00012-EKD-JCH-1)

Argued:  December 12, 2025                              Decided:  February 5, 2026

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

**ARGUED:**  Erin Margaret Trodden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant.  S. Cagle Juhan, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.  **ON BRIEF:**  Mary E. Maguire, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant.  C. Todd Gilbert, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

GREGORY, Circuit Judge:

Jennifer McDonald appeals her thirty fraud-related convictions, including her conviction on one count of aggravated identity theft. She contends that the identity theft alleged by the Government did not occur "during and in relation to" the predicate offense as interpreted by the Supreme Court in *Dubin v. United States*, 599 U.S. 110 (2023). We agree that the district court should have entered a judgment of acquittal on the charge for aggravated identity theft. On all other claims, we affirm the judgment of the district court.

## I.

In August 2021, Jennifer McDonald was indicted on thirty-four counts arising out of various alleged frauds she perpetrated during her stint as Executive Director of the Economic Development Authority of the Town of Front Royal and the County of Warren, Virginia ("EDA"). The charges included 7 counts of wire fraud, 10 counts of bank fraud, 16 counts of money laundering, and 1 count of aggravated identity theft. At trial, the Government offered substantial evidence of McDonald's various complex schemes to use forged deeds, contracts, and letters to divert money from EDA to her personal accounts. As McDonald's convictions cover a wide range of behavior, we will limit our discussion to the facts that are relevant on appeal.

## A.

Jury selection began on August 21, 2023, and the trial commenced on August 24, but it soon experienced delays. On August 31, the district court was informed that one of McDonald's attorneys had tested positive for COVID-19, so the court declared a recess

2

until September 5. In the interim, McDonald tested positive for COVID-19, and the district court further delayed the trial until September 11. By September 18, despite delays, defense counsel represented that they expected the trial to finish even sooner than originally anticipated.

However, additional health issues delayed the trial even further. On September 19, McDonald was admitted to the hospital for issues related to low blood pressure, and jurors were told not to report to court because of "unexpected circumstances." J.A. 3035–36. McDonald was released a few days later, but she was readmitted to the hospital to have a pacemaker installed. On September 26, after consulting with counsel and the jurors, the court rejected McDonald's motion for a mistrial and scheduled trial to resume on October 23. The court instructed jurors "not to speculate as to these unexpected circumstances" and to "think about the case during this break to keep it fresh" in their minds. J.A. 3083, 3090.

On October 23, McDonald fell and hit her head, prompting another delay. The court issued another continuance until October 26, again instructing jurors to keep the case fresh in their minds. On October 26, the day trial resumed, McDonald fainted during the lunch break and was transported to the hospital. The jurors heard the ambulance sirens, but they were moved into the courtroom so that they would not see McDonald being loaded into the vehicle.

The court held a hearing to determine whether McDonald had deliberately caused her ailments, and it concluded that she had not. McDonald again sought a mistrial, which the court denied. Trial concluded on October 31 after delays totaling fifty-one days, with the longest delay reaching thirty-seven consecutive days. At McDonald's request, the court

3

included an instruction to the jury informing them that the delays were caused by McDonald and her counsel catching COVID-19, as well as McDonald's unanticipated need to have a pacemaker implanted.

B.

McDonald's primary defense at trial was that she had entered into a secret settlement agreement with EDA following sexual assault and harassment she experienced, and EDA authorized her various frauds as a way to pay McDonald the agreed-upon sum without disclosing the existence of the settlement. Defense counsel provided the Government with the only known copy of the settlement agreement. The Government presented evidence that FBI investigations had turned up no other copies of the settlement agreement, and an expert witness testified that the only known copy of the settlement agreement contained signatures that had been copied from other documents. On cross-examination, defense counsel elicited testimony that the copy of the settlement agreement had originally been in the possession of a man named James Woods, an associate of McDonald's.

When Woods had been called as a federal grand jury witness in 2021, he testified that he had been involved in negotiations with an EDA board member about a potential property purchase in years prior. According to Woods' grand jury testimony, the board member disclosed during negotiations that McDonald would soon come into a sum of money. The board member then allegedly sent Woods a package of materials related to the proposed transaction, which included a copy of the secret settlement agreement between McDonald and EDA. It was this copy, which Woods told the grand jury he received from the EDA board member, that made its way into the hands of defense counsel.

4

In March 2023, the Government removed Woods from its witness list and served him with a grand jury target letter indicating that he was under investigation for violations of law, including false declarations before a grand jury.

McDonald sought to call Woods as a defense witness, but Woods invoked his Fifth Amendment right and refused to testify. McDonald then attempted to introduce Woods' grand jury testimony under Rule 804(b)(1), but the district court excluded the evidence on the grounds that the Government did not have the same motive to elicit testimony before the grand jury as it would at trial. The district court further ruled that the Government did not open the door to admitting Woods' grand jury testimony by introducing evidence about the settlement agreement, because it was defense counsel who first elicited testimony that the settlement agreement document came from Woods.

C.

During closing argument, defense counsel argued that there were "red flags" in the Government's decision not to call certain witnesses who appeared to have relevant knowledge. J.A. 3526; J.A. 3537 ("And this is another one of those moments where you should wonder why Josie Rickard isn't here . . . . They didn't call her, and that is their job."); J.A. 3543 ("You should wonder what William Sealock would say and whether he is the one Board member who was unwilling to be part of the coverup. The absence of William Sealock is a red flag."); J.A. 3565 ("You should wonder why the government didn't want you to hear from James Woods. And the government didn't call Lenny Campbell."); J.A. 3565 ("[T]his absence of key people when the government bears the burden in this case . . . is a red flag. Red flags are, in a nutshell, reasonable doubt."). After

5

closing arguments concluded, the district court issued an additional jury instruction over McDonald's objection, which the court explained was "a correct statement of law when an argument has been made otherwise." J.A. 3590. The instruction read:

> Although the government is required to prove the defendant guilty beyond a reasonable doubt, the government is not required to present all possible evidence related to the case or to produce all possible witnesses who might have some knowledge about the facts of the case. In addition, as I have explained, the defendant is not required to present any evidence or produce any witnesses. The burden remains with the government.

J.A. 3671. McDonald submitted a motion for a new trial, arguing that the new instruction violated Federal Rule of Criminal Procedure 30 and prejudiced McDonald by indicating to the jury that they should disregard McDonald's closing arguments. The district court denied the motion.

The jury convicted McDonald on all 34 counts. The district court entered a judgment of acquittal on 4 counts of bank fraud.

D.

In all, the Government presented 56 witnesses over the course of several days. McDonald challenges the sufficiency of the evidence for only one of her convictions—aggravated identity theft.

A conviction for aggravated identity theft requires that the identity theft take place "during and in relation to" an underlying felony. 18 U.S.C. § 1028A(a)(1). The jury was instructed that the felony underlying McDonald's charged aggravated identity fraud was the wire fraud charged in Count 1.

6

Count 1 charged McDonald with felony wire fraud related to a September 2016 wire transfer of $2 million from EDA to TLC Settlements, LLC ("TLC"). In August 2016, TLC gave McDonald instructions for how to wire money to TLC's bank account. Evidence presented by the Government demonstrated that after McDonald had these instructions, she was able to complete the wire transfer without further approval from TLC.

On September 8, McDonald provided TLC with contracts for sale of three parcels of land. The contracts listed Curt Tran as the buyer of the properties, and they appeared to be signed and initialed by Tran. McDonald informed TLC that Tran had formed an LLC to take possession of the property, and she emailed TLC a contract addendum that changed the buyer's name to Daboyz, LLC. McDonald also told TLC that Tran had placed the purchase money into an EDA account, but that money had to be transferred to TLC to facilitate the purchase.

McDonald then procured a wire transfer of $2 million from an EDA account to a TLC account. In her conversations with EDA, McDonald presented a different story that did not mention Curt Tran or Daboyz, LLC. Instead, she informed EDA that the Virginia Department of Transportation required $2 million to be transferred to an escrow account to facilitate one of their projects. Relying on McDonald's word, on September 14, EDA's bank wired $2 million to TLC's bank.

TLC received the $2 million and helped Daboyz purchase the three properties for $1.9 million. Shortly after the sale was finalized, McDonald revealed that issues with Tran's nationality would prevent the property purchase after all. Daboyz resold the

properties to the original owner for $1.3 million, and Daboyz kept the $1.3 million in its own account.

At trial, the Government proved (and McDonald does not dispute for the purpose of this appeal) that McDonald was lying to every party at each stage of the process. First, Virginia Department of Transportation had no need for a $2 million escrow account and never requested one. Daboyz, LLC was actually owned and operated by McDonald, and local businessman Truc Vu Tran—known colloquially as "Curt"—had no knowledge about the actions McDonald was taking in his name. McDonald's falsehoods were designed to funnel $2 million out of EDA's account to TLC, and then to procure a portion of that money for herself without drawing suspicion.

## II.

On appeal, McDonald argues that the district court erred in denying her motion for a judgment of acquittal on her conviction for aggravated identity theft. McDonald also claims that the district court erroneously denied her motions for a mistrial and a new trial on the basis of 1) prejudicial delays, 2) improperly excluded evidence, and 3) improper jury instructions. We take each issue in turn.

## A.

We begin with McDonald's conviction for aggravated identity theft. McDonald's conviction on one count of aggravated identity theft required the Government to prove that McDonald, "during and in relation to" a particular felony, knowingly transferred, possessed, or used, without lawful authority, a means of identification of another person.

8

18 U.S.C. § 1028A.  The jury instructions specified that the predicate felony was the charge of wire fraud listed in Count 1, which referred to a September 14, 2016 wire transfer of $2 million from an account controlled by EDA to an account controlled by TLC.  On appeal, there is no debate that McDonald knowingly used, without authorization, the identity of Truc "Curt" Tran in furtherance of her broader efforts to defraud her employer.  The only question is whether the identity theft took place "during and in relation to" the wire fraud charged in Count 1.  Under *Dubin v. United States*, 599 U.S. 110 (2023), we hold that it did not.

The Supreme Court explained in *Dubin* that a defendant uses another person's identification "in relation to" a predicate offense only "when this use is at the crux of what makes the conduct criminal."  *Id.* at 131.  These definitions "refer to offenses built around what the defendant does with the means of identification in particular."  *Id.* at 122.  To be at the "crux" of criminality "requires more than a causal relationship, such as the facilitation of the offense or being a but-for cause of its success."  *Id.* at 131 (internal quotation marks omitted).  In *Dubin* itself, the defendant submitted a claim for Medicaid reimbursement under a patient's name, but he inflated the credentials of the employee who performed the medical services and thereby received a larger reimbursement.  *Id.* at 114.  The use of the patient's name, which was the basis of the aggravated identity theft charge, "was not at the crux of what made the underlying overbilling fraudulent."  *Id.* at 132.  The crux of the fraud was "a misrepresentation about the qualifications of petitioner's employee."  *Id.*  We have applied *Dubin* only once, when we upheld a defendant's aggravated identity theft conviction for submitting Medicaid audit paperwork which falsely

9

appeared to contain declarations signed by her patients. *United States v. Jackson*, 126 F.4th 847, 868 (4th Cir. 2025). Because the "crux" of the fraud was "submitting falsified paperwork," the defendant's conduct fell "cleanly within the aggravated identity theft statute's scope." *Id.* at 868–69.

Courts that have considered 18 U.S.C. § 1028A(a)(1) after *Dubin* distinguish identity theft that constitutes the means of effecting the predicate offense from identity theft that is ancillary to, or merely assists, the predicate offense. *See United States v. Croft*, 87 F.4th 644, 648 (5th Cir. 2023); *United States v. Omotayo*, 132 F.4th 181, 197–98 (2d Cir. 2025) ("[T]he means of identification itself . . . must play some integral role in the success of the scheme."). That dichotomy is on display in *United States v. Gladden*, 78 F.4th 1232 (11th Cir. 2023). In *Gladden*, the Eleventh Circuit considered aggravated identity fraud convictions of two defendants. The first defendant billed prescriptions using the names of clients who neither needed nor received the prescriptions. *Gladden*, 78 F.4th at 1245. The Eleventh Circuit determined that the deception "centered on the identity of the individual receiving the product," and thus upheld the first defendant's conviction for aggravated identity theft. By contrast, the second defendant truthfully indicated the recipient of a prescription but falsely represented that the prescription was medically necessary. *Id.* at 1248–49. This conduct, while still unlawful, did not qualify as aggravated identity theft because the use of the patient's identifying information was ancillary to the deception. *Id.*

The Second Circuit's opinion in *United States v. Omotayo*, 132 F.4th 181 (2d Cir. 2025) further emphasizes that a defendant cannot be convicted of aggravated identity theft

10

when the identity theft merely supports, but does not encompass, the underlying felony. The defendant in *Omotayo* participated in a series of scams designed to convince victims to transfer their own funds to the defendant's co-conspirators. *Id.* at 186. As a "contingency plan," the defendant created a false invoice with another person's name on it for his co-conspirators to show any bank employees who questioned the validity of any transfers. *Id.* at 198. On appeal, the Government argued that the defendant's actions qualified as aggravated identity theft because he had transferred to his co-conspirators this false invoice purporting to bear another person's signature. *Id.* at 197. The Second Circuit determined that the basis of this defendant's convictions was his role ensuring "the fraudulent funds were successfully transferred into and distributed from bank accounts controlled by the conspiracy," not "impersonat[ing] real employees in order to defraud businesses." *Id.* at 199. The defendant could not be convicted of aggravated identity theft because his transfer of the invoice was not at the "crux" of his own criminal behavior. *Id.* at 201.

McDonald's misuse of Tran's identity was an element of her broader scheme to profit from fraudulent behaviors, but it was ancillary to the particular wire fraud charged in Count 1. McDonald's behaviors with respect to this particular scheme can be broken down into two discrete segments: first, EDA's transfer of $2 million to TLC, and second, McDonald's various interactions with TLC that allowed her to pocket $1.3 million. The wire fraud conviction of Count 1 is based on EDA's transfer of $2 million to TLC—not TLC's later transfer to DaBoyz, McDonald's fraudulent LLC.

McDonald's use of Tran's identity was not at the "crux" of EDA's wire transfer to TLC. To induce that transfer, McDonald informed EDA that the Virginia Department of

11

Transportation required $2 million in an escrow account. This was the deception at the heart of McDonald's wire fraud conviction, not her misuse of Tran's identity; in fact, there is no evidence that McDonald raised Tran's name to EDA in the course of encouraging the wire transfer. *Omotayo* is instructive here. Even though, as in *Omotayo*, the misuse of another's identity played a role in the broader scheme, the particular criminal conduct at issue occurred without the identity theft. Even if McDonald had decided not to engage in the second phase of her scheme with TLC, she could still have been convicted on Count 1 for fraudulently inducing the initial transfer.

Tran's identity was not a necessary element of EDA's transfer of the $2 million, nor was it necessary to effect TLC's receipt of the $2 million. Email exchanges between McDonald and TLC's representative demonstrate that TLC communicated wire transfer instructions to McDonald without any request for information regarding the parties involved. J.A. 6623. Indeed, when discussing a wire transfer that occurred in August 2014, the TLC representative indicated to McDonald that TLC had received a wire transfer but had no knowledge of what the transferred money was to be used for. J.A. 6625. In other words, McDonald did not rely upon Tran's identity to ensure processing of the wire transfer that formed the basis of Count 1. She used Tran's identity for a related, but distinct second stage of her plan which was not charged in Count 1.

A predicate offense can have only one "crux." *See Dubin*, 599 U.S. at 127. While McDonald's scheming was multifaceted, the wire transfer in Count 1 focuses on a particular moment: the fraudulent inducement of a $2 million transfer from EDA's account into TLC's account. The falsehood that formed the basis of this transfer, and thus formed

12

the crux of the predicate offense, was McDonald's representation to EDA that the Virginia Department of Transportation requested the transfer. It would not be a stretch to say that use of Tran's identity facilitated the crime of wire fraud—by claiming to represent Tran, McDonald ensured TLC's cooperation in her scheme and was ultimately able to funnel $1.3 million into her own accounts. But the Supreme Court has already rejected a broad reading of the aggravated identity theft statute that would punish use of another's identity in a way that merely "facilitates or furthers the predicate offense." *Dubin*, 599 U.S. at 117 (internal quotation marks omitted). Because no evidence suggests that use of Tran's identity was at the heart of the wire fraud charged in Count 1, the district court should have directed a judgment of acquittal on that count.

B.

McDonald's next claim is that the district court should have granted a mistrial because McDonald was prejudiced by the series of delays at trial. Since her case was complex—a total of 56 witnesses were called, and thousands of pages of documents introduced into evidence—she argues that mid-trial delays impacted the ability of jurors to retain the information necessary to reach an informed verdict. Further, given the last-minute notice to the jurors about delays, and McDonald's absence from the courtroom on the day of her collapse in the courthouse, the jury likely assumed McDonald was the source of the delay even before any instruction was given. If the jury believed her to be the cause of the delay, she argues, they might resent her for taking up more of their time or wonder whether her absences were the result of a guilty conscience.

13

A district court's decision to deny a defendant's motion for a mistrial "is within the sound discretion of the district court and will be disturbed only under the most extraordinary of circumstances." *United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997). Because the district court hewed closely to the procedures we approved in *United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995), we cannot say that the delays in this case represent the extraordinary circumstances required to demonstrate an abuse of discretion.

In *Smith*, this Court declined to require the district court to declare a mistrial after defendant's sudden illness caused a 32-day hiatus in the middle of trial. *Smith*, 44 F.3d at 1269. Though we noted that a long break in a jury trial "can be tolerated only as a rare exception," the district court in *Smith* "was fully aware of the difficulties the hiatus presented and took repeated steps to mitigate the potential for prejudice." *Id.* at 1268. Those steps included: instructions to the jury to keep the case fresh in their minds; extended time for closing argument; extensive jury instructions; and juror access to exhibits and their own notes. *Id.*

The circumstances of this case map neatly onto *Smith*. The jury's longest stretch between hearing trial materials was 37 days, from September 19 to October 26. In anticipation of any difficulties, the district court adopted the same tactics we found sufficient in *Smith* to mitigate the potential for prejudice. It instructed the jury on September 26, and again on October 23, to keep the case fresh in their minds. It gave extended time for closing argument, allowed jurors access to exhibits and their own notes, and gave extensive jury instructions, including instructions to disregard the delay. Further, McDonald's claims of prejudice are similar to those we rejected in *Smith*. Though it is

14

possible that jurors resented her for delays, assumed her guilt because of her health issues, or forgot crucial impeachment evidence, "it can just as easily be speculated that because the government's case was more remote in time, the strength of the prosecution's evidence faded in the jurors' minds." *Id.* at 1268. Under *Smith*, the district court did not abuse its discretion when it rejected the "drastic remedy" of a mistrial. *Id.* at 1268.

## C.

McDonald suggests that the district court should have permitted her to introduce Woods' grand jury testimony under Federal Rule of Evidence 804(b)(1), or alternatively as rebuttal evidence after the Government opened the door to its introduction. We review a district court's interpretation of the Federal Rules of Evidence de novo, and we review its application of such rules for abuse of discretion. *Ward v. AutoZoners, LLC*, 958 F.3d 254, 273 (4th Cir. 2020).

Rule 804(b)(1) provides that the rule against hearsay does not exclude, from an unavailable defendant, testimony that was given as a witness at a hearing and "is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross- or redirect examination." Fed. R. Evid. 804(b)(1). Parties agree that Woods, who invoked his Fifth Amendment right not to testify, qualified as an unavailable witness for the purpose of this Rule. The only question is whether the district court erred in determining that the Government did not have a similar motive to develop Woods' testimony before a grand jury as it would at trial.

Our recent decision in *United States v. Huskey* requires affirming the district court's determination. 90 F.4th 651, 668–70 (4th Cir. 2024). In *Huskey*, this Court upheld the

15

district court's decision to exclude grand jury testimony of an unavailable witness. *Id.* at 669. We reasoned that "grand jury proceedings differ from trials in many ways," since prosecutors use grand juries for many reasons, and "even when a prosecutor is seeking an indictment, the lower burden of proof at the grand jury stage . . . means the prosecutor does not necessarily have a motive to challenge exculpatory grand jury testimony that is similar to the motive at trial." *Id.* (cleaned up). Whether a party had a similar motive requires a fact-specific inquiry into "whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar testimony to prove (or disprove) the same side of a substantially similar issue." *Id.* at 670 (internal citations omitted). We declined to find an abuse of discretion in *Huskey* because the Government barely resisted the witness's testimony at the grand jury, "limiting any follow up questions to mere clarification," but detailed the ways in which it would have "vigorously cross-examined" the witness at trial. *Id.*

The same reasoning applies here. The Government elicited grand jury testimony from Woods but did not attempt to undermine his statements. Instead, as similarly indicated in *Huskey*, the Government explained that it would have vigorously cross-examined Woods at trial with the purpose of showing that Woods was lying about receiving a copy of the settlement agreement from an EDA board member. Importantly, the Government has pointed to specific lines of questioning they would have pursued at trial to undermine Woods' testimony. They detailed that they would have impeached his testimony by raising his federal wire fraud conviction, his text conversations with McDonald in which she asked him about backdating documents, and the expert testimony

16

that the signatures on the purported settlement agreement had been lifted from other documents. Under *Huskey*, the district court did not abuse its discretion in determining that the Government did not have the same motive to develop Woods' testimony before the grand jury as it would have to undermine Woods' testimony at trial.

Nor can we say that the district court abused its discretion by excluding Woods' testimony when offered as rebuttal evidence. Whether a party "opened the door" to otherwise inadmissible evidence is a matter within the district court's discretion. *United States v. Blake*, 571 F.3d 331, 348 (4th Cir. 2009). A district court abuses its discretion when it "(1) acts arbitrarily, as if neither by rule nor discretion, (2) fails to adequately take into account judicially recognized factors constraining its exercise of discretion, or (3) rests its decision on erroneous factual or legal premises." *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (cleaned up).

A party "open[s] the door" to admitting the other side's otherwise inadmissible evidence when the party creates a misleading impression of factual circumstances. *See United States v. McLaurin*, 764 F.3d 372, 384 (4th Cir. 2014) (finding no abuse of discretion where the district court admitted evidence to correct the erroneous impression that defendant had never committed a robbery). The doctrine is primarily concerned with "proportionality and fairness"—the district court may permit inadmissible evidence to parry an attack when "allow[ing] such an attack to go unanswered would [be] unfair." *United States v. Jett*, 908 F.3d 252, 271 (7th Cir. 2018); *Blake*, 571 F.3d at 348. Because the "open door" doctrine is geared towards correcting misleading impressions of fact, the opponent's response must be proportional and directly responsive. When the response

17

"does not directly contradict the evidence previously received, or goes beyond the necessity of removing prejudice in the interest of fairness, it is within the district court's discretion to deny its admittance." *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011).

The district court's decision here to reject the applicability of the open-door doctrine was properly within its discretion. The district court noted that defense counsel's cross-examination first prompted mention that James Woods had provided the only known copy of the settlement agreement to McDonald's attorney. The witness, an FBI agent, had testified only that (1) he had received the copy of the agreement from McDonald's attorney and (2) a search of EDA records had turned up no additional copy. Woods' grand jury testimony is not responsive to either point. Further, the Government's evidence did not unduly prejudice McDonald by leaving the jury with a false impression. Instead, the Government attempted to prove a disputed fact: that the settlement agreement was another of McDonald's fabrications. As with most disputed facts, a party must present admissible evidence to prove its point, and the presentation of admissible evidence does not always open the door to inadmissible evidence. Therefore, the district court did not abuse its discretion here by excluding Woods' grand jury testimony.

D.

After McDonald's closing argument urged the jury to find "red flags" in the Government's decisions not to call certain witnesses, the district court added a jury instruction *sua sponte* to clarify that the Government is not obligated by law to call every witness who might hold relevant information. McDonald claims this instruction violated Federal Rule of Criminal Procedure 30 and that the improper jury instruction was

18

prejudicially responsive to the closing argument she had just given. We review de novo a district court's interpretation of the Federal Rules of Criminal Procedure, but a district court's decision to give a jury instruction consistent with the rules is reviewed for abuse of discretion. *In re C.R. Bard, Inc.*, 810 F.3d 913, 923 (4th Cir. 2016).

Rule 30 requires the district court to "inform the parties before closing arguments how it intends to rule on the requested [jury] instructions." Fed. R. Crim. Pro. 30(b). We have thus far declined to determine the "potentially extremely serious and far reaching question" concerning whether a district court need inform counsel of supplementary instructions prior to closing arguments. *United States v. Burgess*, 691 F.2d 1146, 1156 (4th Cir. 1982). We have limited ourselves to noting that Rule 30 is designed to allow counsel to make informed, intelligent arguments to the jury, *see United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990), and this principle instructs that post-argument instructions should be used sparingly, particularly when responsive to a closing argument. Though refraining from providing this instruction, or granting an additional few minutes for supplemental argument, may have been a "better exercise of discretion," we do not find a Rule 30 violation here because McDonald has failed to show that she was prejudiced by the supplemental instruction. *Id.*; *see id.* ("[A] violation of Rule 30 requires reversal only when the defendant can show actual prejudice.").

McDonald does not claim that the substance of the supplementary instruction was legally erroneous, and therefore the prejudice must lie only in the timing of the supplementary instruction. However, McDonald has not described how she would have adapted her closing argument with the benefit of prior knowledge. We insist that each

19

defendant "must have adequate opportunity to argue [her] innocence under the district court's instructions," *Horton*, 921 F.2d at 546, and that opportunity will often be lacking when the district court issues *sua sponte* instructions that respond directly to a defendant's proper argument. But without McDonald's explanation of how knowledge of the instruction would have "altered the tenor or substance" of her closing argument, we can find no prejudice here. *Id.* at 547.

### III.

For the foregoing reasons, we vacate McDonald's sentence and the district court's order denying McDonald's motion for judgment of acquittal on Count 18, and we remand for resentencing. On all other claims, we affirm the judgment of the district court.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*