# IN THE SUPREME COURT OF IOWA

No. 22–0324

Submitted September 14, 2023—Filed October 20, 2023

**STATE OF IOWA,**

Appellee,

vs.

**WAYLON JAMES BROWN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, James N. Daane, Judge.

The defendant seeks further review of a court of appeals decision affirming his convictions for first-degree robbery and willful injury causing serious injury. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Ashley Stewart, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

The defendant was convicted of first-degree robbery and willful injury causing serious injury for his role in the baseball bat attack of a man outside his apartment complex, where a surveillance camera captured some of the attack. The defendant argues there was insufficient evidence to support his robbery conviction and that the district court should have merged his convictions. He also challenges the district court's denial of his motion for a mistrial based on trial delays resulting largely from COVID-19-related juror absences. The court of appeals rejected the defendant's arguments and affirmed his convictions.

On further review, we agree. There was sufficient evidence to convict the defendant of first-degree robbery based on the victim's testimony and the corroborating surveillance video evidence of the attack. Further, the district court's failure to merge the convictions was appropriate, as it is possible to commit first-degree robbery under the dangerous-weapon alternative without also committing willful injury causing serious injury. That is because there are additional elements of willful injury causing serious injury that are not encompassed within the elements of first-degree robbery under the dangerous-weapon alternative. Additionally, the statutes for robbery and willful injury protect against two different harms. Finally, the district court carefully balanced the defendant's rights with public safety in its decision to continue the trial for nine days due primarily to juror illness. Nothing in the record indicates the defendant was prejudiced by this continuance, so we affirm the district court's denial of a mistrial.

**I. Background Facts and Proceedings.**

Jeremiah Jensen was walking back to his apartment complex from a nearby gas station around 4:30 a.m. on October 20, 2021, when Waylon Brown approached him to talk about an incident from two weeks earlier involving Brown's girlfriend. Jensen told Brown, "I don't care. I got my own problems," and

kept walking. Brown replied, "What?" which led Jensen to reiterate, "I don't care. I got my own problems." Brown responded, "Get him, Tommy," and Thomas White charged at Jensen from one of the nearby cars with a baseball bat in hand.

Jensen "[t]ook off running to get to the front door" of the apartment building, where he knew there was a surveillance camera, as Brown and White chased him. Before he could get inside, Brown shoved Jensen from behind causing Jensen to fall against the door. White then struck Jensen two times in the back of the head with the bat. Jensen heard Brown telling White to take Jensen's backpack, which White eventually took along with Jensen's cell phone before leaving.

Jensen left a trail of blood as he struggled to reach his apartment, where his girlfriend and cousin found him and called 911. When the 911 dispatcher asked if Jensen knew the people who assaulted him, Jensen declared that Brown and White did it. Paramedics transported Jensen to a hospital, where he received thirteen staples on his head to close his wounds.

Detective Nathan West of the Sioux City Police Department investigated the attack, which included reviewing the apartment's surveillance video. Although the surveillance video did not show all of the events because of the camera's placement, it contains around thirty-eight seconds of the attack and allowed Detective West to retrieve still shots of the men involved. The video shows Jensen running to the apartment building with Brown following close behind. White then enters the frame with a baseball bat in his right hand. Jensen and Brown leave the frame as they reach the building's door, but the video continues to show White slow his pace as he grips the bat with both hands. Brown reappears on the screen as White draws the bat back, and the pair surge forward as White swings the bat twice. The video does not show what the bat makes contact

with, though the pair remain on screen and Brown's mouth appears to be moving. Shortly thereafter, Brown and White back up, pause, bend, straighten, and move out of the camera's view. Brown quickly reappears, stepping backward before heading away from the building. White starts to follow, but he quickly turns around to grab Jensen's backpack and then heads in the same direction as Brown.

Detective West presented Brown with still shots from the video and asked whether he knew the men pictured. Brown initially identified White but denied being the other individual pictured. After Detective West showed Brown a clearer image of the video, Brown identified himself and claimed that he was trying to help Jensen by pushing White off of him.

Brown then changed his story, claiming he was sitting outside when he saw Jensen and White run by and heard White yell, "Hey, stop him! He took my shit!" Brown admitted shoving Jensen near the door, but said it was only to help White retrieve his belongings. He denied seeing White with a baseball bat or telling him to take Jensen's backpack.

The State charged Brown with first-degree robbery under Iowa Code sections 711.1 and 711.2 (2021) and willful injury causing serious injury under Iowa Code section 708.4(1). At trial, the State presented testimony from Jensen, Detective West, and Jensen's cousin, who placed the 911 call. The State also introduced the recording of the 911 call and the surveillance video of the incident.

Brown called White to testify as a witness, but White exercised his Fifth Amendment right and refused to answer most questions. This prompted Brown to offer into evidence a handwritten affidavit that White had signed with his version of events, which states:

I was in the alley when I saw [Jensen] with my backpack. He saw me and started running. I saw someone sitting outside the [apartment complex] so I hollered to stop him, "He has my backpack." So [Brown] stopped him at the door. Then that's when I assaulted [Jensen]. [Brown] had nothing to do with it. [Brown] dropped his cigarettes and lighter. I caught up with [Brown] to ask for a cigarette. Then that's when [Brown] asked me, 'What was all that about?' I told him. Then he gave a cigarette to me and said to be careful out there and went on his way. [Brown] had nothing to do with this.[1]

Additionally, Brown testified in his own defense, offering this version of events that he claimed occurred as he saw two men running while sitting outside the apartment complex:

I heard one yell at the other and he said something about my bag. "Hey, he took my bag." So me -- I don't know, I just reacted to it and I ran. And I saw one guy running, he was wearing all black, and I saw one guy in a white shirt. I wasn't sure what he had. I didn't know if he had anything, a weapon or not, so I ran and caught him at the door. I pushed him at the door and stopped him, and from there, then, everything else happened too quick, like, I walked away.

The jury found Brown guilty of first-degree robbery and willful injury causing serious injury. The district court sentenced him to serve consecutive terms of incarceration of twenty-five years on the robbery charge and ten years on the willful injury charge. Brown filed a timely appeal, which we transferred to the court of appeals. The court of appeals affirmed his convictions, and we granted his application for further review.

## II. Standard of Review.

We review Brown's challenge to the sufficiency of the evidence for the correction of errors at law, viewing the evidence in the light most favorable to the State. *State v. Mong*, 988 N.W.2d 305, 312 (Iowa 2023). In doing so, we are bound

---

[1]We have corrected misspellings and other grammatical errors without specifying each alteration, so the only noted alterations are to the apartment complex's name and the use of surnames in place of first names.

by the jury's verdict if it is supported by "evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)). We also review claims of an illegal sentence involving merger for the correction of errors at law. *State v. Bloom*, 983 N.W.2d 44, 49 (Iowa 2022). Finally, we review Brown's challenge to the district court's denial of a mistrial for an abuse of discretion. *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). The defendant is only entitled to a new trial if the prejudice resulting from the denial prevented the defendant from having a fair trial. *State v. Trudo*, 253 N.W.2d 101, 106 (Iowa 1977) (en banc).

**III. Analysis.**

Brown presents three issues on appeal. First, he contends there was insufficient evidence to prove he committed robbery in the first or second degree as the principal or aider or abettor. Second, he argues the district court erred in failing to merge his convictions for first-degree robbery and willful injury causing serious injury. Third, he maintains the district court abused its discretion when it denied his motion for a mistrial based on trial delays stemming from juror absence.

**A. Sufficiency of the Evidence.** Brown asserts there was insufficient evidence to show he committed robbery in the first or second degree as the principal or aider or abettor based on two elements of the crime. Specifically, Brown claims the evidence was insufficient to show he had the intent to rob Jensen or the knowledge that White was armed with a dangerous weapon. We disagree on both fronts, especially viewing the evidence in the light most favorable to the State. *See Mong*, 988 N.W.2d at 312.

Jensen's testimony provided sufficient evidence of Brown's intent to rob him. This included his testimony that Brown initiated the attack by yelling for

White to "[g]et him," and how he heard Brown "telling [White] to take [his] back-pack." "[I]t is the jury's function to determine the credibility of a witness," *State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014), and the jury exercised this function appropriately when it decided Jensen's testimony was more credible than the version of events offered in White's affidavit or Brown's testimony.

Moreover, the jury instructions did not require a finding that Brown knew White was armed with a dangerous weapon despite Brown's claim. It merely required the jury to find that Brown "aided and abetted" White, "who was armed with a dangerous weapon." Because Brown never objected to this instruction, it became "the law of the case for purposes of our review of the record for sufficiency of the evidence." *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009).

The State provided the jury with the surveillance video of the incident, which shows Brown chasing after Jensen with White close behind clearly carrying a baseball bat before he used it to hit Jensen twice. This is certainly sufficient to support the jury's conclusion that Brown "aided and abetted Thomas White, who was armed with a dangerous weapon." Given White's obvious display of the bat, we also find this evidence sufficient even if the jury was instructed that the State needed to show Brown had knowledge that White was armed with a dangerous weapon. Accordingly, we affirm Brown's conviction for first-degree robbery.

**B. Brown's Merger Claim.** Brown challenges the district court's failure to merge his willful injury causing serious injury conviction with his first-degree robbery conviction. Under Iowa Code section 701.9, "[n]o person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted." This statute codifies the double jeopardy protection against multiple punishments for the same offense. *State v. Daniels*, 588 N.W.2d 682, 683–84 (Iowa 1998).

"The legislature defines the offenses and can provide for multiple punishments for separate offenses that apply to the same conduct." *State v. Johnson*, 950 N.W.2d 21, 24 (Iowa 2020) (citing *Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019)). If the legislature intended for there to be multiple punishments, then the Double Jeopardy Clause is not violated, section 701.9 is not applicable, and merger is not required. *State v. Halliburton*, 539 N.W.2d 339, 344 (Iowa 1995) (citing *State v. Finnel*, 515 N.W.2d 41, 44 (Iowa 1994); *State v. Gallup*, 500 N.W.2d 437, 445 (Iowa 1993)). "[I]n deciding whether a punishment is constitutionally permissible under the Double Jeopardy Clause, we look to what punishment the legislature intended to impose." *Id.*

1. *The legal-elements test.* Our first step is "to apply the legal-elements test that compares 'the elements of the two offenses to determine whether it is possible to commit the greater offense without also committing the lesser offense.'" *Johnson*, 950 N.W.2d at 24 (quoting *Halliburton*, 539 N.W.2d at 344). If "a statute provides alternative ways of committing the offense, the alternative submitted to the jury controls." *State v. Anderson*, 565 N.W.2d 340, 344 (Iowa 1997) (citing *State v. Steens*, 464 N.W.2d 874, 875 (Iowa 1991)).

The elements of Brown's first-degree robbery charge were marshaled to the jury as follows:

> 1. On or about October 20, 2021, . . . [Brown]:
>
> a. had the specific intent to commit a theft.; and/or
>
> b. aided and abetted Thomas White, who had the specific intent to commit a theft, and [Brown] aided and abetted Thomas White with the knowledge that Thomas White had such specific intent.
>
> 2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, [Brown] aided and abetted Thomas White who committed an assault upon Jeremiah Jensen . . . .

3. [Brown] aided and abetted Thomas White who was armed with a dangerous weapon.

(It is not necessary that all jurors agree to just "a" or "b" in numbered paragraph 1 in this instruction. It is only necessary that all jurors agree to at least one of the two alternatives.)

The elements of Brown's willful injury causing serious injury charge were marshaled to the jury as follows:

1. On or about the 10th day of October, 2021, [Brown] aided and abetted Thomas White who hit Jeremiah Jensen in the head with a baseball bat.

2. [Brown] aided and abetted Thomas White who specifically intended to cause a serious injury to Jeremiah Jensen.

3. [Brown] aided and abetted Thomas White whose acts caused a serious injury to Jeremiah Jensen . . . .

Brown recognizes that on the surface the elements of the two charges are not identical. Nonetheless, Brown contends that it is impossible for the elements of first-degree robbery to be satisfied without the elements of willful injury causing serious injury being satisfied because the assault language contained in the elements of the first-degree robbery instruction refers to the same act that created the willful injury causing serious injury. Brown focuses on the specific facts of his case, stating that the singular act of striking Jensen with the baseball bat was the only act that could constitute the assault for robbery and the underlying assault for willful injury causing serious injury. However, "[i]n deciding whether a crime is a lesser included offense, we look to the elements of the offense, not to the particular facts of a case." *State v. Johnson*, 950 N.W.2d 232, 237 (Iowa 2020) (citing *Krogmann v. State*, 914 N.W.2d 293, 325 (Iowa 2018)).

When comparing the instructions provided to the jury, Brown's convictions do not satisfy the legal-elements test. There are additional elements of willful injury causing serious injury—primarily the serious injury—that are not present in the elements for first-degree robbery under the dangerous-weapon alternative.

This means that one can commit first-degree robbery without also committing willful injury causing serious injury. For example, one can display a firearm during a robbery without intending to cause or actually causing a serious injury. Thus, merger is not required here because the willful injury causing serious injury conviction requires proof of an additional element that first-degree robbery does not. *See Bloom*, 983 N.W.2d at 51 (citing *State v. McKettrick*, 480 N.W.2d 52, 57 (Iowa 1992)).

This conclusion is not inconsistent with our prior merger cases. In *State v. Hickman*, 623 N.W.2d 847, 852 (Iowa 2001) (en banc), we held that first-degree robbery and willful injury causing serious injury merge because "it is impossible to commit first-degree robbery under the *purposely-inflicts-serious-injury* alternative without also committing willful injury." (Emphasis added.) Relying on *Hickman*, in *State v. Bloom*, 983 N.W.2d at 50, we held that Bloom's conviction for willful injury causing serious injury merged with his first-degree robbery conviction. However, Bloom was charged with first-degree robbery in violation of Iowa Code sections 711.1(1)(*a*) and 711.2. *Bloom*, 983 N.W.2d at 48. Under Iowa Code section 711.1(1)(*a*), "[a] person commits a robbery when, having the intent to commit a theft, the person [commits an assault upon another] to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property." In *Hickman*, the pertinent alternative for committing first-degree robbery was that the defendant purposely inflicted or attempted to inflict a serious injury. Similarly, the pertinent alternative for committing first-degree robbery in *Bloom* was that the defendant commits an assault upon another.

Based on the alternatives presented in *Hickman* and *Bloom*, when the respective defendants committed first-degree robbery, they necessarily committed

willful injury causing serious injury. *See Bloom*, 983 N.W.2d at 50 ("[I]t is impossible to commit first-degree robbery under the purposely-inflicts-serious-injury alternative without also committing willful injury." (quoting *Hickman*, 623 N.W.2d at 852)). The same is not true here. A defendant who commits first-degree robbery under the dangerous-weapon alternative does not necessarily also commit willful injury causing serious injury. That is because there are elements for willful injury causing serious injury that are not encompassed within the elements for first-degree robbery under the dangerous-weapon alternative. Therefore, the legal-elements test is not satisfied.

2. *Whether the legislature intended multiple punishments.* While the legal-elements test indicates the two crimes do not merge, we must also determine "whether the legislature intended multiple punishments for both offenses." *Halliburton*, 539 N.W.2d at 344 (citing *State v. Lewis*, 514 N.W.2d 63, 69 (Iowa 1994)); *see also Bloom*, 983 N.W.2d at 51 (citing *State v. Roby*, 951 N.W.2d 459, 464 (Iowa 2020)). We "are obliged to indulge the presumption that 'in the absence of a clear indication of contrary legislative intent' the legislature ordinarily does not intend cumulative punishment." *State v. Perez*, 563 N.W.2d 625, 628 (Iowa 1997) (quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983)). However, "[i]f one offense is not an included offense within the other, 'there is a presumption that multiple punishments can be assessed.' " *State v. Ceretti*, 871 N.W.2d 88, 92 (Iowa 2015) (quoting *Finnel*, 515 N.W.2d at 43).

Aside from the legal-elements test, when discerning legislative intent, we consider the available punishments for each offense. *State v. Bullock*, 638 N.W.2d 728, 731–32 (Iowa 2002) (citing *Halliburton*, 539 N.W.2d at 344) ("Legislative intent is indicated, in part, by whether the crimes at issue meet the legal elements test for lesser-included offenses."); *see also State v. Goodson*, 958 N.W.2d 791, 804 (Iowa 2021). Specifically, if "the greater offense has a penalty

that is not in excess of the lesser included offense, [then] a legislative intent to permit multiple punishments arises. Otherwise, there would be little point to the greater offense." *Goodson*, 958 N.W.2d at 804 (quoting *State v. West*, 924 N.W.2d 502, 511 (Iowa 2019)).

We also look to whether the sentence for the lesser offense can be enhanced by prior convictions for the same offense. *See id.* at 805 ("Since an enhanced sexual abuse conviction would carry the same or greater punishment as a first-degree burglary conviction, there may 'never be a reason to charge a defendant with the greater offense' when the offender has committed a prior sexual abuse offense. Meaning the legislature must have intended double punishment." (citations omitted) (quoting *West*, 924 N.W.2d at 511)); *Roby*, 951 N.W.2d at 465 ("Moreover, unlike the OWI statute, the speeding statute lacks subsequent-offense enhancements."); *Johnson*, 950 N.W.2d at 25–26 (determining that because "merger would eliminate the subsequent-offense enhancements for marijuana possession," the legislature did not intend for the crimes to merge).

Finally, we examine the dangers the legislature intended to prevent when enacting the statutes at issue. *See Roby*, 951 N.W.2d at 465 ("Here, the lesser included offense is not OWI, but speeding. Eluding while speeding and speeding both involve a driver exceeding the posted speed limit and thereby endangering others."); *Johnson*, 950 N.W.2d at 26–27 ("Another reason we decline to merge these offenses is that eluding and drug possession statutes address distinct dangers."); *Halliburton*, 539 N.W.2d at 344–45 ("Thus, these sections focus on different dangers; section 724.3 is aimed at a class of particularly harmful *weapons*, whereas section 724.26 is aimed at a group of potentially harmful *persons*.").

Here, first-degree robbery is a class "B" felony, punishable by up to twenty-five years in prison, at least half of which must be served prior to being eligible for parole. Iowa Code § 711.2; *id.* §§ 902.9(1)(*b*), .12(3). Willful injury causing

serious injury is a class "C" felony, punishable by up to ten years in prison and a fine of between $1,370 and $13,660. *Id.* § 708.4(1); *id.* § 902.9(1)(*d*). First-degree robbery has a greater punishment than willful injury causing serious injury. Merging willful injury causing serious injury as a "lesser" crime of first-degree robbery would not produce any unintended sentencing consequences or render a first-degree robbery charge pointless. Therefore, when looking at the punishments for both crimes, it is not evident that the legislature intended multiple punishments.

Willful injury causing serious injury is subject to enhancement, which provides for a minimum prison sentence of three years and a maximum of fifteen years. *Id.* §§ 902.8, .9(1)(*c*). Even with the enhancements, first-degree robbery's twenty-five-year maximum and twelve-and-half-year minimum is still more severe than the enhanced punishment for willful injury causing serious injury. This too indicates that the legislature did not intend multiple punishments.

When attempting to discern the dangers the legislature intended to protect against by enacting the statutes for first-degree robbery and willful injury causing serious injury, we look to the language of the statutes themselves. Under Iowa Code section 708.1:

> A person commits an assault when, without justification, the person does any of the following:
>
> (*a*) Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another . . . .
>
> (*b*) Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive . . . .
>
> (*c*) Intentionally points any firearm toward another, or displays in a threatening manner any dangerous weapon toward another.

A person is guilty of willful injury if the person commits "an act . . . which is intended to cause serious injury to another." *Id.* § 708.4. Based on the language of the statute, assault is a necessary component of willful injury. Similarly, a person commits a robbery if, having the intent to commit a theft, the person (1) "[c]ommits an assault upon another"; (2) "[t]hreatens another with or purposely puts another in fear of immediate serious injury"; or (3) "[t]hreatens to commit immediately any forcible felony." *Id.* § 711.1(*a*)–(*c*) (emphasis added). Thus, assault is also a necessary component of a robbery.

However, one can commit an assault without actually inflicting a physical injury. *See id.* § 708.1(*b*)–(*c*). The legislature did not include language in the statute for robbery indicating one must commit an assault *and* cause injury to another; whereas to be convicted of willful injury causing serious injury, an actual injury must occur. *See id.* § 708.4. This indicates that the legislature intended to protect against two different harms by enacting the willful injury and robbery statutes. One statute targets assaults that *actually* result in physical injury; the other statute is aimed at actual or intended thefts accompanied by a *threat* of violence. Because the statutes address distinct dangers, first-degree robbery under the possession of a deadly weapon alternative and willful injury causing serious injury do not merge. *See Johnson*, 950 N.W.2d at 26 ("We have declined to merge offenses when the underlying statutes focus on 'different dangers.'" (quoting *Halliburton*, 539 N.W.2d at 345)).

There are additional elements of first-degree robbery that are not present in willful injury causing serious injury, and there are elements of willful injury causing serious injury that are not present in first-degree robbery. Thus, the legal-elements test is not satisfied. Additionally, the different purposes served by the robbery and willful injury statutes further support the conclusion that the two convictions do not merge and that the separate punishments are lawful.

Accordingly, we affirm Brown's sentences for first-degree robbery and willful injury causing serious injury.

**C. District Court's Denial of a Mistrial.** Brown maintains the district court abused its discretion by denying his motion for a mistrial based on trial delays resulting from juror absences. This requires a summary of the trial timeline, beginning with the commencement of Brown's jury trial on Wednesday, January 19, 2022. After voir dire, the district court made a record of a discussion it had with the parties off the record about how they selected twenty-four jurors for voir dire, leaving them without alternative jurors. It noted, "counsel both agreed that rather than try to amend our process in some way that would end up with additional alternates, counsel agreed we should keep the jury we had and drive on." Counsel for both sides confirmed on the record that they consented to having no alternative jurors. That same day, the parties presented their evidence and rested their cases.

A juror failed to appear the next day and was unreachable, prompting Brown to move for a mistrial based on the juror's absence. The district court denied this request and the additional mistrial request that Brown renewed afterward. Because Brown declined to waive his right to a twelve-person jury panel and the parties had agreed in advance that they would not amend the voir dire process to allow for alternative jurors, the district court asked the other jurors about their availability for the next day. Two reported conflicts, so the district court continued the trial until Monday, January 24. In the meantime, the juror who failed to appear reported to the district court and explained that he had overslept. The district court allowed the parties to voir dire the juror to ensure he could remain impartial. In denying Brown's motion for mistrial, the district court explained,

I was convinced that -- as [the State] said, that [the juror's] remorse was genuine and that he is otherwise an earnest young man, and I think we all saw [that] yesterday both during voir dire and with his assistance with our technical issues. I also sensed my observations of the remaining jury that there didn't appear to be anybody who was upset with having to come back on Monday morning. They were relieved that they weren't forced to come back today or tomorrow and, if anything, they were all happy that they were going to be coming back on Monday, so I didn't sense that there was going to be anybody there that's going to hold anybody accountable for [the juror's] mistake this morning.

When Monday arrived, a different juror was ill. The district court postponed the trial another day before learning Tuesday morning that the ill juror tested positive for COVID-19. In accordance with CDC guidelines at the time, the district court ordered a five-day recess to allow that juror to quarantine before the trial reconvened on Monday, January 28.

Brown asserts that the district court should have granted his motion for mistrial based on these delays, declaring he "should not have had to choose between waiting 9 days for a full 12-jury panel or waiving his right to a 12-jury panel." Brown speculates that this delay violated his right to a fair trial in at least three ways: (1) it is "plausible" that the jurors "could have . . . forgotten" pertinent evidence that "likely adversely impacted Brown and resulted in a biased result" while they "were exposed to outside influences, life circumstances, work, family, and other obligations"; (2) it is "very conceivable that the jury returned and rushed through deliberations in an effort to conclude the trial and move on with their life plans"; and (3) any "fear of being exposed to COVID-19 by being forced to share deliberation space with someone who could still be contagious" could "quite possibly [have caused] them [to] rush through deliberations without thoroughly examining the evidence." But these speculations are just that and do not create an adequate basis for granting a mistrial. *E.g.*, *State v. Piper*, 663 N.W.2d 894, 910 (Iowa 2003) (explaining that the court must assess the risk

of improper jury influence based on objective facts instead of mere speculation), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545 (Iowa 2010).

In fact, there have been cases with longer breaks during the trial than Brown's that did not result in a mistrial. In *State v. Lowder*, 129 N.W.2d 11, 15–16 (Iowa 1964), we rejected the defendant's claim that he did not receive a fair and impartial trial based on the district court's continuance of his trial for a month to give his new counsel an opportunity to prepare after the jury trial had started and received testimony from two witnesses. We also have the guidance of other courts nationwide that have denied mistrials based on COVID-19-related midtrial delays. *See, e.g.*, *United States v. Coversup*, No. 20–30266, 2022 WL 2207309, at *1 (9th Cir. June 21, 2022) (affirming the denial of a mistrial based upon the trial court's grant of a two-week recess to test and quarantine jurors in accordance with then-prevailing CDC protocols); *People v. Breceda*, 290 Cal. Rptr. 3d 899, 914–23 (Ct. App. 2022) (holding mistrial was unnecessary when the trial was suspended for seventy-three days during the state's presentation of its case-in-chief due to the pandemic in mid-2020). Those include *United States v. Frazier*, 625 F. Supp. 3d 752, 754 (M.D. Tenn. 2022), which involved numerous recesses and a three-week shutdown in the middle of one witness's testimony to prevent the spread of COVID-19 among trial participants. In denying a mistrial, the United States District Court for the Middle District of Tennessee addressed many of the same claims that Brown now makes in arguing the district court should have granted his motion for a mistrial. *Id.* at 755–58. For example, the court acknowledged that "breaks in a trial increase the risk that some outside influence will come to bear on a juror," but went on to explain that there was "no basis or reason to suspect that any one or more of them was untruthful when they answered in the negative." *Id.* at 755. That same conclusion applies here.

Similarly, it rejected the same assertion that Brown makes now that the delays may have caused jurors to forget pertinent evidence, explaining, "the same argument could have been made . . . in any lengthy trial for that matter. No doubt, the jurors' recollection of earlier testimony may not be as clear as their remembrance of more recent testimony but that is not a basis for a mistrial." *Id.*; *see also United States v. Smith*, 44 F.3d 1259, 1268 (4th Cir. 1995) ("Inherent in the presentation of any trial lasting a period of days or months is the difficulty caused by the passage of time. As events move further to the past they may be lost through the foibles of memory or they may become fixed as an accepted reality, depending on the impression of the event."). Notably, this was not a complex case, as both sides were able to present their cases on the same day and the jurors had video evidence of the event in question. It ultimately boiled down to whose version of events the jury found more credible, so we struggle to believe Brown's speculation that jurors might have forgotten pertinent evidence due to the delay.

"[A] mistrial is a drastic remedy that results in additional expense to the judicial system as well as to all the parties." *Smith*, 44 F.3d at 1268. Those costs include the time and expense of calling another jury and the risk that evidence will diminish either through the witness's memory over time or willingness to testify. Here, the district court had to detain Jensen to ensure he would testify after he disobeyed a subpoena and skipped a deposition to protect the "[s]afety of [his] children" based on threats Brown relayed to Jensen from jail. A mistrial would have put Jensen's testimony at risk, and, just as importantly, may have impeded Brown's demand for a speedy trial.

The district court appropriately "balanced the rights of defendants and public safety" by following the CDC protocol at the time and allowing the trial to proceed safely with minimal delay. *State v. Basquin*, 970 N.W.2d 643, 654 (Iowa

2022) (explaining how our court used its inherent powers during the COVID-19 pandemic to temporarily allow written guilty pleas to felonies). Nothing in the record indicates that Brown was prejudiced by this delay, especially given the district court's remarks that it "would be unlikely to change the bond requirement" to change Brown's incarceration status even if it declared a mistrial. Accordingly, we affirm the district court's denial of Brown's motion for a mistrial.

### IV. Conclusion.

For these reasons, we affirm Brown's conviction for first-degree robbery, his sentences for first-degree robbery and willful injury causing serious injury, and the district court's denial of his motion for a mistrial.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**