**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――――

**No. 20-4565**

―――――――――――――

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

DRICKO DASHON HUSKEY, a/k/a Drizzy,

       Defendant – Appellant.

―――――――――――――

**No. 20-4572**

―――――――――――――

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

RENAIRE ROSHIQUE LEWIS, JR., a/k/a Banz, a/k/a Esco,

       Defendant – Appellant.

---

**No. 20-4573**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

ALANDUS MONTRELL SMITH, a/k/a Kadafia,

        Defendant – Appellant.

---

**No. 20-4574**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JONATHAN WRAY, a/k/a Jon, a/k/a Yungin,

        Defendant – Appellant.

---

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, District Judge. (3:17-cr-00134-FDW-DSC-34; 3:17-cr-00134-FDW-DSC-43; 3:17-cr-00134-FDW-DSC-69; 3:17-cr-00134-FDW-DSC-82)

---

Argued:  October 25, 2023                Decided:  January 8, 2023

---

Before RUSHING and HEYTENS, Circuit Judges, and KEENAN, Senior Circuit Judge.

---

2

Affirmed by published opinion. Judge Heytens wrote the opinion, in which Judge Rushing and Judge Keenan joined.

————————

**ARGUED:** Kelly Margolis Dagger, ELLIS & WINTERS LLP, Raleigh, North Carolina; William Stimson Trivette, WILLIAM S. TRIVETTE, ATTORNEY AT LAW, PLLC, Greensboro, North Carolina; Erin Margaret Trodden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia; William Robinson Heroy, GOODMAN, CARR, LAUGHRUN, LEVINE & GREENE PLLC, Charlotte, North Carolina; for Appellants. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Paul K. Sun, Jr., ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant Jonathan Wray. Daniel Roberts, GOODMAN, CARR, LAUGHRUN, LEVINE & GREENE PLLC, Charlotte, North Carolina, for Appellant Renaire Lewis. Juval O. Scott, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant Alandus Smith. Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

————————

3

TOBY HEYTENS, Circuit Judge:

Four people were charged with conspiracy under the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1962(d), and related crimes involving their membership in the United Blood Nations (UBN)—a national prison and street gang. After a long trial, all were convicted. The defendants challenge their convictions and sentences. We conclude the challenges lack merit and affirm the district court's judgments.

I.

A.

Because the defendants were convicted after a trial, we describe the evidence "in the light most favorable to the Government." *United States v. Burgos*, 94 F.3d 849, 854 (4th Cir. 1996) (en banc) (citation removed). The defendants were members of the Nine Trey Gangsters, a UBN "set" with territory in Shelby, North Carolina. JA 455. UBN sets are hierarchical, with a lineup (or whip) led by, in descending order, a Godfather, High OG (original gangster), and Low OG. Star generals are under each Low OG, from the highest ranking five-star general to the lowest ranking one-star. Gang members go by "tags," or gang names. JA 753.

UBN members follow a code requiring them, among other things, to follow the chain of command, defend the gang's reputation, and pay dues. Members can pay dues by selling drugs, robbing, and stealing. They are also expected to "put in work" for the gang— that is, engage in "criminal activity" like assaults, robberies, shootings, or murder, and generally "do what [they're] told"—as part of their membership and to elevate in rank. JA 588, 753.

4

Dricko Huskey was a Low OG who "[oversaw] the Shelby area." JA 600. Huskey dealt drugs from at least 2013 through his arrest in 2016, including regularly supplying a higher ranking UBN member. After a public dispute in 2016, Huskey shot and killed Donnell Murray.

Renaire Lewis was a one-star general. Lewis dealt drugs and participated in a robbery at the direction of higher ranking UBN members. During that robbery, Lewis fired gunshots that wounded Tanner Cobb and killed Malik Brown.

Alandus Smith was a high-ranking Nine Trey member, described variously as a Low OG, a five-star general, and a four-star general. A 2014 search of Smith's bedroom turned up a drug ledger revealing Smith's regular deals with other UBN members. When police searched Smith's home during a 2015 arrest, they found $400 in cash, 15 methamphetamine tablets, nine baggies of marijuana, digital scales, and a gun with an obliterated serial number.

Jonathan Wray was a Nine Trey member of unknown rank. Wray dealt drugs from at least 2011 to 2015. Wray admitted shooting and killing Christopher Odoms, a member of the Crips, a rival gang.

## B.

Huskey, Lewis, Smith, and Wray were charged along with three others in a 23-count indictment. (The other three people do not figure into this appeal; we refer to Huskey, Lewis, Smith, and Wray collectively as "defendants.")

Count 1 charged all defendants with conspiring to violate RICO for their actions as UBN members. The government also gave notice of various special sentencing factors on

5

that charge that could expose the defendants to additional punishment. The first accused the defendants of "agree[ing] that multiple acts of murder would be committed" as part of the RICO conspiracy. JA 218. Other sentencing factors accused Huskey of killing Donnell Murray, Lewis of killing Malik Brown, and Wray of killing Christopher Odoms.

Lewis faced five more charges. Those charges were: murder in aid of racketeering; attempted Hobbs Act robbery; attempted murder in aid of racketeering; and two counts of using and carrying a firearm during and in relation to crimes of violence, one of which resulted in death.

Smith was charged with four other offenses. Those charges were: possessing marijuana with intent to distribute it; possessing methamphetamine with intent to distribute it; possessing a firearm in furtherance of a drug trafficking offense; and possessing a firearm after being convicted of a felony.

C.

The defendants pleaded not guilty and were tried together. Each unsuccessfully moved for a judgment of acquittal. Subject to one exception, the jury found the defendants guilty of every charged offense and responsible for every sentencing factor. The sole exception involved Huskey. Despite finding him responsible for the murder of Donnell Murray, the jury declined to find that Huskey "agreed to conduct and participate in the conduct of the affairs of the [RICO] enterprise through a pattern of racketeering activity that included acts involving murder." JA 3570.

The district court sentenced Huskey to life imprisonment, Lewis to life in prison plus 20 years, Smith to 300 months of imprisonment, and Wray to life imprisonment.

6

II.

We begin with the defendants' sufficiency challenges. We do so because any defendant who prevails on this point is entitled to a judgment of acquittal without further proceeding. See *Burks v. United States*, 437 U.S. 1, 16 (1978) (government gets only one "fair opportunity to offer whatever proof it [can] assemble"). Despite several evidentiary challenges (which we discuss in Part III, below) we consider "all the evidence considered by the jury, both admissible and inadmissible" when assessing a sufficiency challenge. *United States v. Simpson*, 910 F.2d 154, 159 (4th Cir. 1990); accord *Lockhart v. Nelson*, 488 U.S. 33, 40 (1988).

In resolving a sufficiency challenge, we view the evidence in the light "most favorable to the prosecution" and assume the jury resolved all credibility disputes or judgment calls in the government's favor. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). We must uphold the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). Applying these standards, we conclude the defendants have not met their "heavy burden" to show their convictions were not supported by substantial evidence. *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (quotation marks removed).

A.

All four defendants challenge the sufficiency of the evidence to support their RICO conspiracy convictions. Those convictions "require[d] proof that: (1) an enterprise affecting interstate commerce existed; (2) each defendant knowingly and intentionally

7

agreed with another person to conduct or participate in [its] affairs; and (3) each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts" in furtherance of the conspiracy. *United States v. Zelaya*, 908 F.3d 920, 926 (4th Cir. 2018) (quotation marks removed). As relevant here, "racketeering activity" includes murder, robbery, and controlled substances offenses that violate state law. 18 U.S.C. § 1961(1).

1.

Huskey alone argues there was insufficient evidence to establish that he was a UBN member, thus defeating any claim he agreed to conduct or participate in the enterprise's affairs. We are unpersuaded. True, "the RICO conspiracy statute does not criminalize mere association with" a RICO enterprise and requires a "knowing agreement to participate" in its affairs. *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (quotation marks removed). But we have reviewed the evidence and conclude it was sufficient to show Huskey's knowing agreement to participate in the UBN's activities. Two former members identified Huskey as a UBN member. The witnesses discussed Huskey's UBN activities, including his leadership roles and participation in disciplining other UBN members. Law enforcement witnesses also identified social media posts and photos of Huskey with other UBN members, wearing gang-affiliated colors and using gang signs. The jury reviewed Huskey's text messages and social media, which used UBN slang and otherwise reflected gang membership. Along with other evidence in the record, this evidence made it reasonable for the jury to find Huskey agreed to participate in the RICO enterprise's affairs.

8

2.

All four defendants insist there was no evidence to establish the third element—that their criminal activities related to the UBN's affairs. Per this argument, each defendant's drug trafficking, robberies, and murders were personal pursuits by people who happened to be affiliated with the UBN. And because this criminal activity was personal, not gang related, the defendants say the government failed to prove they "knowingly and willfully agreed that" they, or someone else in the conspiracy, "would commit at least two racketeering acts." *Zelaya*, 908 F.3d at 926 (quotation marks removed).

Here too, we are unconvinced. The jury heard evidence that UBN members regularly trafficked drugs to pay dues to UBN, that UBN members are expected to respond to public displays of disrespect (at issue with Huskey's murder of Murray and Wray's murder of Odom) with violence, and that UBN members are expected to "put in work" (JA 753)—including committing violent crimes—as part of gang membership. Along with the other evidence in the record, this evidence made it reasonable for the jury to find that defendants' drug trafficking, robberies, and murders were committed in relation to the UBN enterprise.

3.

Unlike the other three defendants, the jury was not asked to—and did not—find Smith personally committed any murders. From that, Smith argues the government did not show he agreed he "would commit at least two racketeering acts." *Zelaya*, 908 F.3d at 926 (quotation marks removed). But the government was not required to show each defendant committed each type of racketeering act charged in the indictment. See *United States v.*

9

*Barronette*, 46 F.4th 177, 207 (4th Cir. 2022) ("RICO conspiracy does not requir[e] the Government to prove each conspirator agreed that he would be the one to commit two predicate acts." (quotation marks removed)). Instead, proving a RICO conspiracy charge requires showing each defendant "knowingly and willfully agreed that he *or some other member of the conspiracy* would commit at least two racketeering acts." *Zelaya*, 908 F.3d at 926 (emphasis added) (quotation marks removed). For that reason, Smith's conviction on Count 1 is valid if the government proved he agreed that at least two racketeering acts would be committed as part of the criminal enterprise. See *Barronette*, 46 F.4th at 207 ("attribut[ing]" murder committed by some appellants "to each [a]ppellant as members of the RICO enterprise").

The government met that burden. The jury found, through a special sentencing factor, that Smith agreed multiple acts of murder would be committed as part of his UBN activities. The finding was supported by evidence that UBN members were expected to engage in criminal activity—including "to potentially kill someone for the gang" (JA 588)—as part of membership, and by Smith's high rank within the organization.

Smith challenges this latter point, asserting his rank alone does not permit an inference he agreed murders would be committed as part of the UBN enterprise. To support this argument, Smith cites *United States v. Barnett*, 660 Fed. Appx. 235 (4th Cir. 2016), for the proposition that "simply being a member of the gang is not sufficient to show that the person engaged or agreed that someone else would engage in two predicate racketeering acts." Oral Arg. 15:08. But *Barnett* is a weak reed to rely on, both because it is unpublished and because the defendant whose conviction was vacated in that case was not a UBN

10

member at all—much less a high-ranking one like Smith. See *Barnett*, 660 Fed. Appx. at 248.

Smith is right that "the RICO conspiracy statute does not criminalize mere association with an enterprise." *Mouzone*, 687 F.3d at 218 (quotation marks removed). But high-ranking members like Smith are not merely associated with the UBN. The jury could reasonably have inferred from Smith's high rank that he knew about and agreed to UBN's overall objectives—which, substantial evidence showed, included murders. Nothing more was required. See *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) ("The partners in the criminal plan need only agree to pursue the same criminal objective, regardless of whether that criminal objective is ever stated or carried out." (quotation marks removed)).

### 4.

For similar reasons, Lewis's and Wray's sufficiency challenges to the sentencing factors fail too. Indeed, Lewis and Wray conceded their participation in the enterprise, and the jury found they both personally committed at least one murder. Along with the other evidence, this was sufficient to support the jury's verdict.

### B.

Lewis also raises sufficiency challenges to four of the five counts unique to him. (Lewis does not contest sufficiency on Count 13, which charged him with attempted Hobbs Act robbery.) Each challenge fails.

11

1.

Counts 12 and 15 charged Lewis with murder in aid of racketeering and attempted murder in aid of racketeering. Both convictions stem from a robbery where Lewis fired shots that killed one victim and wounded another. Lewis argues the robbery and resulting murder and attempted murder were a "personal thing" unrelated to the UBN. Defs. Consol. Br. 56 (quoting JA 2767–68 (coconspirator's testimony)). But the evidence showed Lewis was recruited by another UBN member to participate in the robbery, committed the robbery with other UBN members, and followed orders from UBN superiors when disposing of the guns after the robbery. The evidence also showed UBN members were expected to commit violent crimes such as robberies and murders on behalf of the gang. It was thus not unreasonable for the jury to conclude the government met its burden to show Lewis "committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Zelaya*, 908 F.3d at 927 (quotation marks removed).

2.

Count 14 charged Lewis with using a firearm during and in relation to a crime of violence resulting in death. Tracking the indictment, the district court instructed the jury on two alternative theories for the underlying crime: murder in aid of racketeering as charged in Count 12 and attempted Hobbs Act robbery as charged in Count 13. Lewis did not object to this instruction or otherwise argue before the district court that Count 12 or Count 13 could not serve as a valid predicate. The jury found Lewis guilty on Count 14 without specifying the predicate(s) on which that finding was based.

12

More than two and a half years later, the Supreme Court held one of the predicates charged in Count 14—attempted Hobbs Act robbery—does not qualify as a crime of violence under the relevant statute. See *United States v. Taylor*, 142 S. Ct. 2015, 2025–26 (2022). Smith raises *Taylor* in his opening brief, but the ask he makes of us is narrow. Smith does not challenge the district court's jury instructions—a claim that would be reviewed only for plain error given Smith's failure to raise the issue in the district court. See Fed. R. Crim. P. 52(b). Nor does Smith argue that the district court's instructing the jury on something *Taylor* holds is a legally invalid predicate (attempted Hobbs Act robbery) requires vacating his conviction on Count 14 even if the evidence was sufficient to support the still-valid predicate (murder in aid of racketeering). See generally *Yates v. United States*, 354 U.S. 298 (1957). As a result, any such arguments are forfeited, and we decline to consider them. See *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

The argument Lewis presses is far more limited. Lewis argues that, after *Taylor*, the attempted Hobbs Act theory is not supported by law and he is entitled to a judgment of acquittal on Count 14 because the other theory—murder in aid of racketeering as charged in Count 12—failed for insufficient evidence. Because we conclude the evidence was sufficient to support Count 12, see Part II(B)(1), *supra*, we reject this argument as well.

3.

Like Count 14, Count 16 accused Lewis of using and carrying a firearm during and in relation to a crime of violence—this time, the attempted murder in aid of racketeering charged in Count 15. Lewis's two-paragraph sufficiency challenge to Count 16 simply

13

reprises his sufficiency challenge to Count 15. And because we have already rejected the latter claim, see Part II(B)(1), *supra*, we reject this one as well.

C.

Smith's remaining sufficiency challenges also fail. Smith does not dispute the adequacy of the evidence supporting his convictions for possessing marijuana with the intent to distribute it (Count 17) or possessing a firearm after being convicted of a felony (Count 20). Instead, Smith says the government failed to present sufficient proof that he possessed methamphetamine with the intent to distribute it (Count 18) or that he possessed a firearm in furtherance of a drug trafficking offense (Count 19). Neither claim succeeds.

1.

When Smith was arrested, the police seized 15 methamphetamine pills. The seized pills were packaged together, not separately—which Smith argues rebuts any intent to distribute. But the arresting officers testified 15 pills were a "distribution amount." JA 1760–61, 1780; see JA 1738 (methamphetamine was "more than a user amount"). A reasonable jury could conclude that this evidence, along with Smith's Facebook messages and a drug ledger showing Smith conducted a drug business over a long time, supported Smith's methamphetamine conviction.

2.

The government also showed Smith possessed a firearm in furtherance of a drug-trafficking offense. "Furtherance" is defined broadly to mean "advanc[ing]" or "help[ing] forward," and includes possessing a gun to protect the drugs or the drug distributor or to use "as an enforcement mechanism in a dangerous transactional business" or "serve as a

14

visible deterrent." *United States v. Moore*, 769 F.3d 264, 270 (4th Cir. 2014) (quotation marks removed). When Smith was arrested, police found a gun with an obliterated serial number alongside the evidence of his drug-trafficking offenses. We do not hold that the gun's proximity to the drugs, standing alone, would be enough. But that proximity, coupled with the obliterated serial number and the other evidence—which tends to suggest the gun was used in connection with illegal activity—supports Smith's Section 924(c) conviction.

III.

Having concluded this is not among the "rare" cases requiring reversal for insufficient evidence, *United States v. Haas*, 986 F.3d 467, 477 (4th Cir. 2021) (quotation marks removed), we turn to the evidentiary challenges. Lewis argues the district court *should not* have admitted his un-Mirandized statements or a text message chain between him and a still-unknown person. Huskey says the district court *should* have admitted certain grand jury testimony and unsworn informant statements. On each issue, we see no reversible error.

A.

1.

Lewis asserts the district court should have suppressed certain statements he made because he was not given *Miranda* warnings at a meeting his attorney arranged and during which he had an attorney present with whom he could—and did, in fact—consult. The district court rejected that argument, and so do we.

Lewis identifies no decision from any court concluding *Miranda* warnings are required under such circumstances. To the contrary, "[i]t is generally accepted that if [an]

15

attorney was actually present during the interrogation, then this obviates the need for the warnings." 2 Wayne R. LaFave et al., Crim. Proc. § 6.8(a) (4th ed. 2023) (LaFave).

We need look no further than *Miranda* itself to see why Lewis's challenge is misplaced. In that case, the Supreme Court recognized that both the constitutional rights not to "be compelled . . . to be a witness against [one]self," U.S. Const. amend. V, and to have "the Assistance of Counsel" in one's defense, U.S. Const. amend. VI, could be "put in jeopardy" by "official overbearing." *Miranda v. Arizona*, 384 U.S. 436, 442 (1966). To ensure the "constitutional rights of the individual could be enforced against overzealous police practices," that Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. As the Court explained, the *Miranda* warnings protect people who have been "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures" "created for no purpose other than to subjugate the individual to the will of his examiner." *Id.* at 457.

Such circumstances are absent here. For one thing, this was not a government-created atmosphere. Instead, "[t]he interview was arranged ahead of time, and with the assistance of [Lewis's] counsel." JA 3585.[1] What is more, Lewis had counsel present the entire time and even consulted privately with his lawyer during a break in the interview.

---

[1] According to a leading treatise, "there is a split of authority" about whether *Miranda* warnings are required when the defendant's attorney "arranged for the contact" but "was not present" during the questioning. 2 LaFave § 6.8(a). We need not consider that issue here.

The facts here well-illustrate the Supreme Court's observation in *Miranda* that "[t]he presence of counsel . . . would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege" against compulsory self-incrimination. 384 U.S. at 466.

Against all this, Lewis cites just one case: *Sweeney v. Carter*, 361 F.3d 327 (7th Cir. 2004). That decision does not help him. True, *Sweeney* rejected the idea that a suspect's pre-interrogation conversations with counsel "can double for the usual warnings given by law enforcement officers" in situations where warnings would otherwise be required. *Id.* at 331. But the court ultimately held Sweeney had "knowingly and voluntarily waived his *Miranda* rights" despite not having been given *Miranda* warnings. *Id.* The reasons the court gave were that Sweeney had counsel during the meeting, discussed the possibility of cooperation with counsel before the meetings, and attended the meetings for the purpose of cooperating with authorities. *Id.* This situation is not materially different. We thus reject Lewis's *Miranda* claim.

## 2.

Lewis also insists the district court should not have admitted a text message exchange between him and an unknown declarant under Federal Rule of Evidence 801(d)(2)(E). Reviewing that decision "for an abuse of discretion[,]" *United States v. Lighty*, 616 F.3d 321, 351 (4th Cir. 2010), we see none here.

At trial, Lewis objected to the admission of the following exchange, which occurred the night before the robbery and murder of Malik Brown (for which the jury found Lewis responsible):

17

| Unidentified: | yoooo |
| Unidentified: | another lick even sweeter |
| Lewis: | What's goodie |
| Unidentified: | remember that [n-word] that pulled up at my crib with the Beamer |
| Lewis: | Yea |
| Unidentified: | gotta get that [n-word] |
| Unidentified: | he got the trees and bread |
| Lewis: | Gz |

SA 1, ECF 84.

Unless an exception applies, hearsay "is not admissible" in federal trials. Fed. R. Evid. 802. Hearsay is generally defined as an out-of-court statement offered "to prove the truth of the matter asserted in the statement." *Id.* at 801(c)(2). But Rule 801(d), in turn, excludes from that definition certain statements that would otherwise qualify as hearsay. As relevant here, Rule 801(d)(2)(A) and (E) provide that "[a] statement . . . is not hearsay" if it "is offered against an opposing party and" "(A) was made by the party in an individual or representative capacity" or "(E) was made by the party's coconspirator during and in furtherance of the conspiracy."

As much as Lewis's brief can be read as suggesting the entire thread should not have been admitted, that is plainly wrong. Lewis admits he made the three statements attributed to him—"What's goodie," "Yeah," and "Gz." Those statements are thus excluded from the definition of hearsay by Rule 801(d)(2)(A) and could not properly be excluded under Rule 802.

That leaves the statements by the other person. The messages were retrieved from

18

Lewis's phone, and the government admitted it did not have evidence about the declarant beyond the statements themselves. The government still argued—and the district court agreed—that the unknown declarant's statements were admissible under Rule 801(d)(2)(E). We see no abuse of discretion in that conclusion, and thus need not address the government's alternative arguments for admissibility.

As this Court has explained, Rule 801(d)(2)(E) does not require "the offering party to identify the declarant by name." *United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010). "Instead, the offering party need only show that the unknown declarant was more likely than not a conspirator." *Id.* (quotation marks removed). As with other "preliminary [factual] questions" relevant to admissibility, a district court's ruling on this point is "subject to a clearly erroneous standard of review." *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992); see *Bourjaily v. United States*, 483 U.S. 171, 181 (1987).

The district court made no clear error in concluding the government met its burden. The government introduced evidence that, in UBN slang, "lick" means "robbery" (JA 606), "trees" means "cannabis" (JA 850), "bread" means "money" (JA 797), and "gz" means "okay" (JA 2750). The government also introduced evidence that, the day after the text message exchange, Lewis tried to rob Malik Brown for "[s]ome weed." JA 2748. Testimony further established UBN members regularly committed robberies as part of their duties to the UBN. Because the messages contained UBN slang and discussed UBN business that happened the next day, it was reasonable for the district court to conclude the unknown declarant was "more likely than not a conspirator." *Ayala*, 601 F.3d at 268 (quotation marks removed). We thus hold the district court committed no abuse of

19

discretion in admitting the text messages.[2]

B.

We turn now to Huskey's evidentiary challenges. Unlike Lewis's efforts to keep evidence out, Huskey claims the district court erred in preventing him from introducing two types of evidence. Still reviewing the district court's evidentiary rulings for abuse of discretion, *Lighty*, 616 F.3d at 351, we again see none.

1.

Huskey challenges the district court's exclusion of grand jury testimony by a former UBN member who said Huskey was in the UBN "a long time ago" but "got kicked out." U.S. Br. 35 (quoting relevant testimony). There is no doubt those statements constitute hearsay and were inadmissible unless an exception applies. But Huskey argues the statements should have been admitted under Federal Rule of Evidence 804(b)(1). That hearsay exception has three requirements. First, "the declarant [must be] unavailable as a witness." Fed. R. Evid. 804(b); see *id.* at 804(a) (defining unavailability). Second, the statements must have been "given as a witness at a trial, hearing, or lawful deposition." *Id.* at 804(b)(1)(A). Third, the statements must be "now offered against a party who had . . . an opportunity and similar motive to develop [the statements] by direct, cross-, or redirect examination." *Id.* at 801(b)(1)(B).

Most of these requirements are satisfied. The government concedes the former UBN

---

[2] Despite passing references to the Confrontation and Due Process Clauses, Lewis's brief makes no separate constitutional argument. Any such claim is thus forfeited. See *Grayson O Co.*, 856 F.3d at 316.

member was unavailable as a witness at Huskey's trial. See Oral Arg. 26:30–27:06. No one denies grand jury testimony satisfies the requirement that the prior statement have been "given as a witness at a trial, hearing, or lawful deposition." Fed. R. Evid. 804(b)(1)(A); accord *United States v. Salerno*, 505 U.S. 317, 321 (1992) (noting parties' concession on that point). And the government had an opportunity to develop the unavailable witness's testimony—after all, the government summoned that witness to appear before the grand jury in the first place.

The only question is thus whether the district court abused its discretion in concluding the government lacked a similar motive during the grand jury proceeding compared to the one it would have had at trial. That requirement is a precondition for admitting hearsay statements under Rule 804(b)(1)(B), and we have no authority to slight it. See *Salerno*, 505 U.S. at 321 (emphasizing that "[n]othing in the language of Rule 804(b)(1) suggests that a court may admit former testimony absent satisfaction of each of the Rule's elements" and declining to prevent the government from benefiting from the "similar motive requirement" in criminal cases).

The government argues—and we agree—that the Second Circuit's decision in *United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc), sets out the appropriate legal standard. As that decision recognized, "[w]hether the degree of interest in prevailing on an issue is substantially similar at two proceedings will sometimes be affected by the nature of the proceedings." *Id.* at 912. "Where both proceedings are trials and the same matter is seriously disputed . . ., it will normally be the case that the side opposing the version of a witness at the first trial had a . . . similar . . . motive [as] at the second trial."

21

*Id.* In contrast, grand jury proceedings differ from trials in many ways. Prosecutors often use grand juries "to investigate possible crimes and identify possible criminals" rather than simply secure an indictment—something that can make it "quite unrealistic to characterize the prosecutor as the 'opponent' of a witness's version." *Id.* at 913. And even when a prosecutor is seeking an indictment, the lower burden of proof at the grand jury stage (probable cause versus beyond a reasonable doubt) means the prosecutor does not "necessarily" have "a motive to challenge [exculpatory grand jury] testimony that is *similar* to the motive at trial." *Id.*; see *id.* (identifying other reasons why a prosecutor's motives may differ between a grand jury proceeding and trial).

Like the Second Circuit, we reject any per se rule "that the prosecutor's motives at the grand jury and at trial are almost always dissimilar" or "that the prosecutor's motives in both proceedings are always similar." *DiNapoli*, 8 F.3d at 914. Instead, "the inquiry as to similar motive must be fact specific." *Id.* The ultimate question is "whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue." *Id.* at 914–15.

Applying those standards here, we hold the district court committed no abuse of discretion. The government emphasizes the witness testified before the grand jury "that she had joined the UBN 15 years earlier, had actively participated in the gang only for approximately three years, and . . . no longer saw or talked to UBN members." U.S. Br. 97. Had the witness testified at trial, the government asserts it "would have vigorously cross-examined her, likely emphasizing her lack of connection to the UBN in Shelby and her

22

inability to provide any supporting details, including even a loose estimate of when Huskey was kicked out of the gang." *Id.*

To be sure, forgone cross-examination is not a conclusive factor, see *DiNapoli*, 8 F.3d at 914, but we find it particularly indicative of the government's motive here. Far from resisting the witness's offered testimony, our review of the relevant grand jury transcript shows the prosecutor quickly moved from topic to topic, limiting any follow up questions to mere clarification. The district court permissibly concluded the prosecutor was not testing the witness's account but "trying to learn things about the case" and "determine whether there was sufficient evidence by probable cause for indictment." JA 2877. We thus hold the district court committed no abuse of discretion in excluding the grand jury testimony.

2.

Huskey's other evidentiary argument is that the district court abused its discretion by refusing to admit statements by confidential FBI informants under Federal Rule of Evidence 807. That is a big swing, and it does not connect.

Rule 807 is captioned "Residual Exception." It provides that even hearsay statements that would otherwise be inadmissible are not "excluded by the rule against hearsay" so long as:

(1) the statement is supported by sufficient guarantees of trustworthiness— after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

23

Fed. R. Evid. 807(a). This exception is "used very rarely, and only in exceptional circumstances." *United States v. Heyward*, 729 F.2d 297, 299–300 (4th Cir. 1984) (quotation marks removed).

The district court committed no abuse of discretion in concluding such exceptional circumstances were lacking. Huskey argues the unsworn statements contain "sufficient guarantees of trustworthiness," Fed R. Evid. 807(a)(1), because lying during FBI interviews would defeat the purpose of cooperating as an informant. But the district court did not exceed its discretion in concluding the statements here cannot be accepted as reliable. For one, the statements are internally inconsistent, with one informant saying Huskey was stripped of his rank but was still a UBN member and another saying Huskey was kicked out of the group and had a hit out on his head. The unsworn statements also contradicted undisputed evidence. For example, Huskey's presentence report does not show any arrests for December 2012, which casts doubt on the reliability of an informant's statement that, during that month, Huskey was cooperating with law enforcement while in jail to reduce his time. What is more, the informant's claim that Huskey moved out of the Shelby area after a "hit" was placed on his head by the UBN in 2012 is hard to square with trial testimony showing that Huskey was selling drugs in Shelby's UBN-controlled territories in 2013 and to Nine Trey leadership all the way up to his 2016 arrest. We thus conclude the district court did not act arbitrarily or irrationally in excluding the informants' internally inconsistent and uncorroborated unsworn statements to the FBI.

IV.

Wray challenges two features of the government's closing argument and one aspect

24

about how the district court instructed the jury. Here too, we see no reversible error.

## A.

Wray made no objections during the government's closing. As a result, his challenges are reviewed only for plain error under Federal Rule of Criminal Procedure 52(b). To meet that "difficult" standard, it is not enough for Wray to establish there was an error. *Puckett v. United States*, 556 U.S. 129, 135 (2009). Rather, Wray also must show that: (a) any error was plain; (b) the error affected substantial rights, "meaning that there is a reasonable probability that, but for the error, the outcome of the proceeding would have been different"; and (c) "the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *United States v. Heyward*, 42 F.4th 460, 465 (4th Cir. 2022) (quotation marks removed). Wray has "the burden of establishing each of" these elements, *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021), and he fails to carry it.

## 1.

To begin, we perceive no reversible error in Wray's "Golden Rule" arguments. The government briefly asked the jury to "[i]magine you're Chris Odoms" at "a party where you think you're safe from violence." JA 3502. According to Wray, these remarks crossed the line by "urg[ing] jurors to identify individually with the victim[]." *United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015). On the other hand, the government never took the second step of asking the jurors to approach their task as they imagined Odoms might want them to or to punish Wray as they would have wanted had they been the victim of the charged crimes. See *Leathers v. General Motors Corp.*, 546 F.2d 1083, 1085–86 (4th Cir.

25

1976); accord *Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732, 741 & n.10 (5th Cir. 1978).

In the end, we need not decide whether the remarks Wray challenges were improper—much less clearly or obviously so—because we conclude Wray failed to satisfy the third plain error requirement by showing any error affected his substantial rights. Wray's argument that the comments "encouraged the jurors to convict" based on "sympathy," Defs. Consol. Br. 82, does not satisfy us that the comments affected his substantial rights.

2.

Wray fails to show that the government obviously engaged in improper witness vouching or that any such vouching affected his substantial rights. "Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993).

On appeal, Wray identifies three comments he claims were problematic. The first occurred when, after summarizing evidence from testifying witnesses, a prosecutor said those witnesses were "not making [] up" their identifications of Wray. JA 3374. But the prosecutor immediately followed up that statement by saying: "The credibility of the witness is for you to decide. You. Not myself, not any of these fine lawyers here." *Id.* The prosecutor then made a permissible argument about credibility—noting that, although government witnesses benefit from testifying at trial, this sort of testimony is common in a case like this and only works because it is in the witness's interest to be honest. See JA 3374; see also *United States v. Jones*, 471 F.3d 535, 544 (4th Cir. 2006)

26

(prosecutor's statement that "given the circumstances of a plea agreement . . . it is more in the subject's interest to be honest than to be dishonest" was a permissible argument about credibility (quotation marks removed)). In our view, it is neither clear nor obvious that a reasonable juror would have believed the prosecutor was expressing an improper personal belief in the credibility of the witnesses.

The other two comments Wray challenges were made by a different prosecutor during the government's rebuttal. Both were framed as responses to something a defense lawyer said during their own closing argument that the government sought to cast as endorsing a government witness's testimony. In one such instance, the prosecutor "thank[ed]" Wray's counsel for "vouch[ing] for the credibility of" a government witness by describing the witness as "very believable" and "telling the truth" and stated that the government "agree[d]" the witness "was very believable." JA 3498–99. The other example was when the prosecutor "thank[ed]" Smith's attorney for "vouching for the truthfulness of" a government witness by "salut[ing]" the witness "for coming here and telling his story and telling truth" and stated that "the Government would agree" the witness "came here and he told the truth." JA 3509.

Whether these comments "indicate[] a personal belief in the credibility or honesty of a witness" and "prejudicially affected the defendant" is a closer question. *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997). The government concedes at least one statement was "stronger than it should have been" but maintains the statements were not misrepresentations and did not amount to improper vouching. Oral Arg. 41:14–25. We need not decide whether the prosecutor's admittedly strong statements constituted

27

improper vouching, much less clearly or obviously so. Instead, we hold that Wray fails to satisfy his burden to show that any error affected his substantial rights.

Wray insists the jury would have had reason to question the credibility of the two witnesses for whom the prosecutor vouched because those witnesses were "testifying in exchange for compensation, protection, or sentencing consideration from the Government." Defs. Consol. Br. 80. But that credibility argument alone cannot satisfy Wray's burden of showing that—without the prosecutor's comments—there is a reasonable probability the outcome of the proceeding would have been different. See *United States v. Odum*, 65 F.4th 714, 722 (4th Cir. 2023). Having "examine[d] the record as a whole," we conclude Wray fails to satisfy the substantial rights requirement. *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993).[3]

### B.

Wray's jury instruction challenge also fails. We "review a district court's decision to give a particular jury instruction for abuse of discretion . . . and review whether a jury instruction incorrectly stated the law de novo." *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). "This review requires us to consider the jury instruction in light of the whole record, to determine whether it adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *United States v. McCauley*, 983 F.3d 690, 694 (4th Cir. 2020) (quotation marks removed).

---

[3] Wray's brief also takes passing shots at other comments he claims were "improper remarks . . . about defense counsel." Defs. Consol. Br. 84–85. Because Wray fails to "develop [any] argument" about those remarks—none of which were objected to at trial— any claim based on them is doubly forfeited. See *Grayson O Co.*, 856 F.3d at 316.

To understand Wray's argument, it is necessary to explain a seemingly unrelated portion of the trial. During closing argument, Lewis's counsel criticized the government for not playing a video showing an interview of a government witnesses or providing an FBI agent's written summary of that interview. The district court called a sidebar and admonished counsel that "you can't put the burden on the Government to present evidence favorable to your client." JA 3430. The court immediately told the jury to disregard counsel's argument "that certain documents should be put on the document camera." JA 3435. After all defense closing arguments concluded, the court told the jury it "want[ed] to add to an earlier instruction I gave you, an oral instruction after a sidebar." JA 3497. Referencing its earlier statement "that the Government cannot be held responsible for documents that the Government under the Federal Rules of Evidence [] couldn't introduce [to] you," the court added the same principle "also applies to some reference of videos that were taken by the Government." *Id.*

Wray objected before the court's second instruction, arguing it might leave the jury with the impression the government had additional inculpatory evidence it could have presented to the jury if not for the Federal Rules of Evidence. On appeal, Wray argues the first instruction was specific to Lewis's counsel's statement, but the second instruction was broader and legally erroneous because the court could not know that unspecified documents and videos were barred by the rules of evidence.

Wray's argument misreads the context of the district court's instruction. As noted above, the second argument began with a direct reference to the first. The court then clarified that its instruction about the documents mentioned in Lewis's closing argument

29

also applied to any reference to videos. This second instruction is no broader than the first, which Wray does not argue was legally erroneous. Additionally, the district court carefully explained to counsel that the defendants could discuss a "lack of evidence" but could not "accuse[]" the government of having "access to evidence that could be beneficial to the defendant and blam[e] the Government for not producing that." JA 3538. We see no abuse of discretion here.

V.

All four defendants challenge their sentences. We reject each argument.

A.

Huskey and Wray assert the district court erred in sentencing them to life imprisonment on the RICO conspiracy count. We disagree.

The statutory maximum sentence for a RICO offense is generally 20 years. See 18 U.S.C. § 1963(a). But the maximum penalty increases to life imprisonment if the RICO "violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." *Id.* Because murder is a form of racketeering activity, see § 1961(1), whose maximum sentence is life imprisonment, see § 1111(b), Huskey and Wray are subject to that increased maximum sentence if their RICO violations were "based on" the racketeering activity of murder.

The Sixth Amendment requires that "any fact"—here, that murder was one of the relevant racketeering acts—"that increases the penalty for a crime beyond the [otherwise] prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Seeking to comply with

30

*Apprendi*, the indictment charged, and the jury was asked to determine, the presence or absence of various special sentencing factors. Special Sentencing Factor 1 alleged that all the defendants, "[a]s part of their agreement to conduct and participate in the conduct of the affairs of the UBN enterprise through a pattern of racketeering activity, . . . agreed that multiple acts of murder would be committed." JA 218. Special Sentencing Factor 2 accused Wray of killing Christopher Odoms "willfully with malice and after premeditation and deliberation." *Id.* And Special Sentencing Factor 6 charged Huskey with killing Donnell Murray "willfully with malice and after premeditation and deliberation." JA 219–20. The jury answered Special Sentencing Factor 1—the multiple murders accusation—"yes" with respect to Wray but "no" with respect to Huskey. The jury answered "yes" to both Special Sentencing Factors 2 and 6, which accused Huskey and Wray of specific individual murders. The district court sentenced both Huskey and Wray to life imprisonment on the RICO conspiracy count.

Huskey and Wray challenge the district court's ability to increase their maximum sentence based on the jury's individual murder findings. Huskey argues the district court could not impose a life sentence because the jury declined to find Special Sentencing Factor 1 as to him, and, at least as to him, "both special sentencing factors [were] required to support a sentence above twenty years." Defs. Consol. Br. 96. Wray similarly argues that Special Sentencing Factor 2 "could not be used to increase Wray's statutory maximum, because it was not a finding that Wray's RICO conspiracy conviction was *based on* the killing of Odoms." *Id.* at 109.

We see no reversible error. The record is clear that everyone involved understood

31

the purpose of the special sentencing factors was to comply with *Apprendi* and assess the defendants' eligibility for an enhanced sentence. But neither Huskey nor Wray objected to the indictment or the verdict form on the ground that Sentencing Factors 2 and 6 were insufficiently tied to the RICO conspiracy charge. Neither Huskey nor Wray made this argument when the parties and the court discussed the language of possible jury instructions explaining the verdict form. And when the district court suggested the language of the verdict form itself was sufficient without a jury instruction, neither Huskey nor Wray objected. To the extent that Huskey and Wray now argue the special verdict form should have been clearer or did not adequately describe what the jury needed to find, that claim is forfeited, and we conclude any error was not clear or obvious.

The only remaining question is whether the evidence was sufficient to support a finding on Special Sentencing Factors 2 and 6—that Huskey murdered Donnell Murray and that Wray murdered Christopher Odoms—as part of their agreement to participate in the UBN enterprise. We have already concluded that it is. See Part II(A)(2), *supra*. For that reason, the district court did not err in concluding that the jury's findings were sufficient to trigger an increased statutory maximum sentence under 18 U.S.C. § 1963(a).

Like the district court, we reject Huskey's assertion that "the jury found the murder had nothing to do with the RICO conspiracy." Defs. Consol. Br. 94. Because the jury had to first find the defendants guilty of the RICO conspiracy offense before it could find the sentencing factors, the verdict form made clear the question presented in the sentencing factors related to the RICO conspiracy offense. See JA 3570, 3577 (verdict form referring to "the offense charged in Count One"). The jury thus found the RICO violation was "based

32

on" the racketeering activity of murder, and the district court in turn had authority to impose a life sentence. 18 U.S.C. § 1963(a).

Huskey and Wray raise two other arguments that need not detain us long. As for Huskey, we disagree with his assertion that the jury's failure to find Special Sentencing Factor 1—that Huskey agreed "multiple acts of murder" would be committed as part of his agreement to participate in UBN affairs (JA 218)—prevented the district court from imposing a life sentence. Although it was necessary for the jury to find Huskey guilty on Count 1 before it could answer the questions posed by the sentencing factors, it was unnecessary for the jury to answer one sentencing factor before reaching the other or to answer the same way on both sentencing factors. This does not mean, as Huskey asserts, that "[S]entencing [F]actor 1 did not mean anything." Defs. Consol. Br. 96. Rather, it means the indictment gave the government two options for triggering an enhanced sentence. (Indeed, it appears any other reading would deprive Sentencing Factors 2 and 6 of independent legal effect.)

Wray's argument that his life sentence is invalid because the evidence could not support the jury's finding on Special Sentencing Factor 1 fails twice over. For one thing, we have already concluded the evidence was sufficient to support that finding. See Part II(A)(4), *supra*. Second, we conclude that the evidence was sufficient to support the jury's finding on Special Sentencing Factor 2—which found Wray's agreement to participate in the RICO enterprise included his murder of Christopher Odoms—and that finding independently authorized the district court to impose a life sentence.

33

B.

Moving from the Constitution to the advisory Federal Sentencing Guidelines, Huskey challenges the district court's application of a three-level increase in his offense level on the ground that he "was a manager or supervisor" of "criminal activity [that] involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Again, we see no reversible error.

At sentencing, Huskey objected to the role adjustment on the ground that he was not a five-star general in the UBN. The district court overruled the objection, explaining "[t]he evidence did show the defendant was a 5–Star General . . . and then became a Low. . . . So that objection is overruled." JA 3615. That factual finding was not clearly erroneous. See *United States v. Bartko*, 728 F.3d 327, 345 (4th Cir. 2013) (district court's factual findings at sentencing are reviewed for clear error). At trial, one former UBN member testified Huskey "was a 4–Star" general. JA 598. Another former UBN member testified that Huskey at one point "took over" another five-star general's line (JA 932), and that the highest rank she recalled Huskey reaching was "Low [OG]," JA 927. Other evidence supported the witness's testimony about Huskey's rank. For example, Huskey had the authority to discipline another gang member, which he could only do according to the UBN hierarchy if he had other members "under" him. JA 667.

Huskey also insists evidence of his rank could not support the enhancement because no witness "quantified what gang ranks meant in terms of people supervised." Defs. Consol. Br. 96. We agree this Court's precedent requires more than bare evidence of rank to support the relevant enhancement. See *United States v. Cameron*, 573 F.3d 179, 185 (4th

34

Cir. 2009) (requiring evidence of "the *actual* exercise of control," not just "the *potential* to exercise control over an operation"). But the trial evidence established Huskey ordered retaliation, disciplined other UBN members, and distributed "Inglewood" (documents such as codes, oaths, and pledges) to lower-ranking members. JA 600. Huskey thus "actively exercised some authority over other participants in the operation or actively managed its activities," as required for the role adjustment. *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011).

## C.

Lewis asserts the district court erred in concluding it had to impose a 10-year consecutive sentence on Count 14, which accused him of using and carrying a firearm in connection with a crime of violence that resulted in the death of Malik Brown. Because Lewis did not make this argument before the district court, the plain-error standard applies. See *United States v. Olano*, 507 U.S. 725, 732 (1993). We reject Lewis's challenge because we conclude he cannot satisfy the third requirement for relief under that standard—*i.e.*, showing that the error affected his substantial rights.

No doubt, there was an error here and that error is clear under current law. See *Henderson v. United States*, 568 U.S. 266, 279 (2013) (holding an error's plainness is always assessed "at the time of appellate consideration" (quotation marks removed)). Long after Lewis was sentenced, the Supreme Court abrogated this Court's earlier precedent and held that a sentence under the relevant statutory provision—18 U.S.C. § 924(j)—"can run either concurrently with or consecutively to another sentence." *Lora v. United States*, 143 S. Ct. 1713, 1715 (2023). Given *Lora*, the government concedes "the district court

35

plainly erred when it found that it was required to impose a mandatory consecutive sentence for Lewis's § 924(j) offense." U.S. Supp. Br. 3–4.

But Lewis "has the burden of establishing each of the four requirements for plain-error relief," *Greer*, 141 S. Ct. at 2097, and we conclude he cannot satisfy the substantial rights requirement. As Lewis admits, he is subject to two sentences of life imprisonment—one on Count 1 and the other on Count 12. This Court has held a defendant cannot show an impact on substantial rights where a sentencing error involves a term of years sentence on one count and the defendant also faces a concurrent life sentence on another count. See *United States v. Ellis*, 326 F.3d 593, 600 (4th Cir. 2003). We see no reason—and Lewis identifies none—why the result should be different where the faultily imposed term of years sentence would be served only after the expiration of a life sentence. See *United States v. Yousef*, 327 F.3d 56, 164 (2d Cir. 2003) (reaching same result on plain-error review); see also *Harris v. Warden*, 425 F.3d 386, 387 (7th Cir. 2005) (observing that " 'life' and 'life plus x years' come to the same thing").

Though acknowledging "[t]he present futility of challenging the plus of a life-plus sentence," Lewis argues "the additional term" the district court imposed on Count 14 "could be considered in a future compassionate release motion, commutation request, or some other unforeseeable change in sentencing policy." Lewis 2d Supp. Br. 2 n.1. Even outside the plain-error context, this Court has rejected similar arguments, describing them as "speculative and unrealistic." *United States v. Charles*, 932 F.3d 153, 161 (4th Cir. 2019). We do not rule out the possibility that some criminal defendants might be able to offer a non-speculative explanation about how a consecutive sentence tacked onto a life

36

sentence will affect their substantial rights because of the circumstances of their case. See *Ruiz v. United States*, 990 F.3d 1025, 1035–41 (7th Cir. 2021) (Wood, J., dissenting) (offering one such account). But Lewis falls far short of meeting that burden here.

D.

Finally, Smith challenges the reasonableness of his sentence, which we review for an abuse of discretion. See *Gall v. United States*, 552 U.S. 38, 51 (2007). We "first ensure that the district court committed no significant procedural error, such as" "failing to adequately explain the chosen sentence." *Id.* We then "consider the substantive reasonableness of the sentence," "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range" and "giv[ing] due deference to the district court's decision that the [18 U.S.C.] § 3553(a) factors, on a whole, justify the extent of the variance." *Id*. Applying these standards, we conclude Smith's sentence is procedurally and substantively reasonable.

Smith's presentence report classified him as a career offender and suggested a total sentence between 360 months and life. Smith faced a statutory mandatory minimum sentence of 60 months in prison for his Section 924(c) firearm offense. At the sentencing hearing, Smith requested a downward variance to 120–180 months, arguing for several mitigating factors. The district court sentenced Smith to 300 months in prison.

1.

In challenging procedural reasonableness, Smith mainly argues the district court failed to address his nonfrivolous reasons for requesting a downward departure. See *United States v. Bollinger*, 798 F.3d 201, 220 (4th Cir. 2015) (a court must "address the party's

37

arguments and explain why [it] has rejected those arguments" (quotation marks removed)). We disagree.

The district court thoughtfully addressed each of Smith's arguments. Smith asserted several mitigating factors, including that his troubled childhood made him vulnerable to the UBN; his activities in the UBN took place when he was young and were limited to low-level drug dealing; and he had since renounced allegiance to the gang.

The court acknowledged Smith's youth at the time of his prior offenses but explained it was "troubling" that Smith was a "long-term gang member in the drug business." JA 3706–07. The court considered Smith's "history and characteristics" to be "neutral," weighing both "in [his] favor" and "against [him]." JA 3707. It reasoned: "[T]here comes a point where you're no longer a victim, but you actually are a leader of the gang. You've reversed your roles, and that happened to you clearly when you became a 4 or 5 Star General." JA 3708. The court also noted Smith was a "recidivist," and both his early crimes and his more recent ones involved guns and drugs. JA 3706–09. The court explained that possessing a gun with an obliterated serial number "shows [Smith's] willfulness to commit these crimes and not get caught." JA 3709. And although Smith said he had matured and made efforts to improve himself, the court decided Smith cannot "wash [his] hands of" "the crimes [he] committed while [he was] a gang member" and considered that "debt to society" as a "factor[]" in the length of Smith's sentence. JA 3707. We conclude that, in addressing Smith's arguments, the district court "set forth enough to satisfy" us that it had "a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).

38

2.

We also reject Smith's substantive reasonableness challenge.

First, Smith suggests he would have received a lower sentence if he pleaded guilty rather than going to trial. But that is true of many criminal defendants, see U.S.S.G. § 3E1.1, cmt. n.3, and because the district court never mentioned Smith's decision to go to trial rather than pleading guilty, there is no indication the sentencing court "[p]unish[ed] Smith more harshly based upon [that] decision." Defs. Consol. Br. 106.

Next, Smith argues it was unfair to "dramatically increase[]" his sentence based on crimes committed when he was 17 years old. Defs. Consol. Br. 107. As already discussed, however, the court considered each of Smith's mitigation arguments, including his youth at the time of his previous convictions.

Finally, Smith says it was substantively unreasonable to give him a longer sentence than a higher-ranking UBN member received at a related trial. But the district court expressly took the other UBN member's sentence into account, saying that sentence was "one big reason" for applying a downward variance in Smith's case. JA 3709–11 ("The Court is concerned about just punishment . . . . [Y]ou shouldn't be so disproportionately punished[.]"). The court concluded, however, that Smith's requested 120–180-month variance was "substantially too low for the repeat criminal conduct, for the position in the Bloods," and for "the fact that . . . [Smith was] a very serious drug dealer" who "dangerous[ly] combin[ed] drugs and guns" and was convicted of multiple individual, serious crimes. JA 3710–11. We thus defer to the district court's "reasoned and reasonable

decision that the § 3553(a) factors, on the whole, justified the sentence." *Gall*, 552 U.S. at 59–60.

\*    \*    \*

Having rejected each defendant's challenges to their convictions and sentences, the judgments of the district court are

*AFFIRMED*.

40